**OILER, Admr., Appellant,**

v.

**WILLKE et al., Appellees.**

[Cite as *Oiler v. Willke* (1994), 95 Ohio App.3d 404.]

Court of Appeals of Ohio,
Ross County.

No. 93CA1975.

Decided June 30, 1994.

*Isaac, Brant, Ledman & Becker, Charles E. Brant, J. Stephen Teetor* and *James M. Roper;  Oths & Heiser, Joseph A. Oths* and *Robert Russell Miller,* for appellant.

*Lane, Alton & Horst, John M. Alton* and *Mary Barley–McBride,* for appellees.

HARSHA, Presiding Judge.

Mildred Oiler, administrator of the estate of Candy L. Fisher, the deceased, appeals the lower court's grant of summary judgment to defendant Thomas J. Willke, M.D., and his professional corporation in this wrongful death action. Appellant alleges the following assignment of error:

"The lower court erred in granting summary judgment in favor of defendant-appellee Thomas J. Willke."

This appeal arises from the following facts.

On October 17, 1980, eighteen-year-old Candy Fisher visited Thomas J. Willke, M.D. of Wilmington Family Physicians, Inc., complaining of purple marks on her body. After an initial examination, Dr. Willke made a provisional diagnosis of idiopathic thrombocytopenia purpura ("ITP"). ITP is a condition in which the body destroys its own platelets, resulting in spontaneous bleeding that manifests itself with purple or red lesions on the skin.

When Fisher was admitted to the hospital on October 17, her platelet count was 7,500, well below the normal range of 150,000 to 200,000. Based on this information, Dr. Willke ordered twelve units of platelet transfusions for Fisher, and then eventually twelve more when her platelet level dropped after the initial transfusions. The second transfusion, however, also failed to increase her platelet level to an acceptable amount, and the next day steroid therapy was initiated. At first, the steroid therapy also proved ineffective, but after the dose was increased, Fisher's platelet count rose to 157,000.

On October 24, 1980, a bone marrow biopsy was performed by Pushpa Makkar, M.D., which resulted in a diagnosis of idiopathic thrombocytopenia purpura. Fisher was discharged the next day, on October 25. Approximately four years later, in December 1984, Fisher again presented herself to Wilmington Family Physicians, Inc., complaining of fatigue and weight loss. She was diagnosed with Acquired Immune Deficiency Syndrome ("AIDS"), and eventually died on February 10, 1991.

On February 7, 1992, plaintiff Mildred Oiler, as administrator of the estate of Candy Fisher, filed this lawsuit, which initially involved several plaintiffs and defendants. Eventually, all claims were dropped except this wrongful death action against Thomas Willke, M.D. and Wilmington Family Physicians, Inc. In essence, plaintiff claims that the platelet transfusions given to Fisher were unnecessary and negligent on the part of Dr. Willke. Plaintiff alleges that as a result of these transfusions, Fisher contracted AIDS, and thus Dr. Willke's allegedly negligent platelet transfusions resulted in Fisher's death. The defendant moved for summary judgment on the ground that AIDS was not a foreseeable risk in 1980, and thus defendants were not liable as a matter of law. Defendant also contended that Fisher could not prove that the transfusion was the proximate cause of her disease and ultimate death. The trial judge agreed with defendants, and granted their motion for summary judgment, based upon the lack of foreseeability of transmitting the AIDS virus at the time of the transfusion. This appeal followed.

In reviewing a summary judgment, the lower court and the appellate court utilize the same standard, *i.e.*, we review the judgment independently and without deference to the trial court's determination. *Midwest Specialties, Inc. v. Firestone Co.* (1988), 42 Ohio App.3d 6, 8, 536 N.E.2d 411, 413–414. Summary

judgment is appropriate when the following have been established: (1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence construed most strongly in its favor. *Bostic v. Connor* (1988), 37 Ohio St.3d 144, 146, 524 N.E.2d 881, 883–884; cf., also, *State ex rel. Coulverson v. Ohio Adult Parole Auth.* (1991), 62 Ohio St.3d 12, 14, 577 N.E.2d 352, 353–354; Civ.R. 56(C). The burden of showing that no genuine issue exists as to any material fact falls upon the moving party in requesting summary judgment. *Mitseff v. Wheeler* (1988), 38 Ohio St.3d 112, 115, 526 N.E.2d 798, 801. A motion for summary judgment forces the nonmoving party to produce evidence on any issue for which (1) that party bears the burden of production at trial, and (2) for which the moving party has met its initial burden. See *Stewart v. B.F. Goodrich Co.* (1993), 89 Ohio App.3d 35, 623 N.E.2d 591, and *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095, paragraph three of the syllabus. Further, it should be noted that in a wrongful death action, issues of negligence and proximate cause are generally questions of fact to be resolved by a jury. *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 288, 21 O.O.3d 177, 181, 423 N.E.2d 467, 471–472. Having set forth the appropriate standard of review, we must now determine whether the plaintiff has presented sufficient evidence in order to preclude summary judgment against her wrongful death claim.

In order to maintain a wrongful death action, a plaintiff must generally show (1) the existence of a duty owed to the decedent; (2) a breach of that duty; (3) (which was) the proximate cause of the death. *Littleton v. Good Samaritan Hosp. & Health Ctr.* (1988), 39 Ohio St.3d 86, 529 N.E.2d 449. In a wrongful death action predicated on medical malpractice, the duty that the physician owes the patient is the same in all cases: to treat the patient in a manner that a physician of ordinary skill, care and diligence would under similar circumstances. *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, 75 O.O.2d 184, 346 N.E.2d 673; *Ryne v. Garvey* (1993), 87 Ohio App.3d 145, 155, 621 N.E.2d 1320, 1326–1327. Normally, whether a physician has breached the duty of ordinary care must be sufficiently established by expert testimony so that a reasonable juror could find that the defendant acted negligently. *Bruni, supra,* 46 Ohio St.2d at 130–133, 75 O.O.2d at 186–188, 346 N.E.2d at 676–678; see, also, *Hoffman v. Davidson* (1987), 31 Ohio St.3d 60, 31 OBR 165, 508 N.E.2d 958.

Appellees' motion for summary judgment raises two issues: (1) whether Dr. Willke can be liable as a matter of law for Fisher's death despite the fact that AIDS was not foreseeable in 1980, and (2) whether the transfusion given by Dr. Willke was the proximate cause of her death. We look first to the latter issue.

Appellees' motion contends that appellant cannot produce evidence sufficient to raise a genuine issue of material fact that the transfusion was the source of Fisher's AIDS infection, *i.e.*, the proximate cause of her death.[1] Proximate cause is normally a question of fact for the jury, *Strother, supra*, 67 Ohio St.2d at 288, 21 O.O.3d at 181, 423 N.E.2d at 471–472, but where there is no evidence to establish causation, the trial court must grant judgment on a properly supported motion. Civ.R. 56(C). However, contrary to appellees' argument, appellant did provide the necessary summary judgment evidence in compliance with Civ.R. 56(C) to establish a genuine issue of material fact concerning causation. The affidavit of Dr. Merz, which was attached to the appellant's memorandum contra, states his opinion, phrased in terms of a reasonable degree of medical probability, that Fisher contracted AIDS as a result of the blood transfusions she received in 1980. Notwithstanding appellees' arguments that Dr. Makkar's deposition is not properly before the court, Dr. Merz's affidavit, when viewed in a light most favorable to the appellant, satisfies her burden under *Wing, supra*, of producing evidence on this issue.

We look now to the issue of foreseeability which is considerably more troublesome. Appellees argue somewhat logically that because both parties agree that the risk of contracting AIDS through a transfusion was not medically known in 1980, Dr. Willke could not have breached any duty to Fisher in that regard as a matter of law. See, *e.g.*, *Kozup v. Georgetown Univ.* (D.D.C.1987), 663 F.Supp. 1048, affirmed in part and vacated in part (C.A.D.C.1988), 851 F.2d 437 (stating that it was not until 1984 that the medical community reached a consensus that AIDS was transmitted by blood); see, also, *Jeanne v. Hawkes Hosp. of Mt. Carmel* (1991), 74 Ohio App.3d 246, 598 N.E.2d 1174 (AIDS was foreseeable by March 1985). Appellant counters that the specific injury involved need not be foreseeable in order to find a breach of the duty of due care; it is sufficient for appellant to establish that appellees should have known that "an injury" or "some injury" was possible as a result of his conduct. In essence, appellees contend that Dr. Willke owed Fisher no duty concerning unknown (unforeseeable) risks; appellant argues that only the general character or type of harm is required to be foreseeable, not its precise nature, before Dr. Willke can be charged with the duty to take precautions.[2]

---

1. We deal here with proximate cause in the sense of "cause in fact," *i.e.*, the injury would not have occurred *but for* the negligence of the actor, *not* the concept of legal responsibility as limited by the notion of foreseeability. See fn. 2 and the discussion which follows.

2. In a wrongful death action based on medical malpractice, the duty of the physician is established simply by the existence of a physician-patient relationship, not by questions of foreseeability. See *Ryne v. Garvey* (1993), 87 Ohio App.3d 145, 621 N.E.2d 1320; Prosser & Keeton, *infra*, Section 53. As noted *supra*, the duty of a physician is to treat a patient with the

At the outset, it should be noted that one of the reasons this issue is difficult is because the concept of foreseeability is intertwined not only with duty, but also with proximate cause. See, e.g., *Mussivand v. David* (1989), 45 Ohio St.3d 314, 320–321, 544 N.E.2d 265, 271–272; Prosser & Keeton, *infra*, Section 42. Because appellees refute liability by simply alleging that the harm was not foreseeable, and do not attempt to specify whether they are challenging "duty" or "proximate cause," we must first determine the framework in which we will consider their argument. Thus, we begin our analysis with a review of hornbook law on negligence by Prosser & Keeton, Torts (5 Ed.1984):

"Section 43. Unforeseeable Consequences

"Negligence, it must be repeated, is conduct which falls below the standard established by law for the protection of others against *unreasonable* risk. It necessarily involves a *foreseeable* risk, a threatened danger of injury, and conduct unreasonable in proportion to the danger. If one could not reasonably foresee *any* injury as the result of one's act, or if one's conduct was reasonable in the light of what one could anticipate, there would be no negligence, and no liability. *But what if one does unreasonably fail to guard against harm which one should foresee, and consequences which one could in no way have anticipated in fact follow?* Suppose, for example, that a defect in a railway platform offers at most the foreseeable possibility of a sprained ankle; but as a result of it a passenger dies of inflammation of the heart? Or one's negligent driving threatens another with something like a broken leg, but instead causes the other to be shot?

"There is perhaps no other one issue in the law of torts over which so much controversy has raged, and concerning which there has been so great a deluge of legal writing. At the risk of becoming wearisome, it must be repeated that *the question is primarily not one of causation,* and never arises until causation has been established. *It is rather one of the fundamental policy of the law, as to whether the defendant's responsibility should extend to such results.* In so far as the defendant is held liable for consequences which do not lie within the original risk which the defendant has created, a strict liability without fault is superimposed upon the liability that is logically to be attributed to the negligence itself. It is simpler, and no doubt more accurate, to *state the problem in terms of legal responsibility: is the defendant legally responsible to protect the plaintiff against such unforeseeable consequences of the defendant's own negligent acts?* But to

---

care that an ordinary physician under similar circumstances would. What the appellees must do, or avoid doing, is a question of the standard of conduct required to satisfy this duty. *Id.* Appellees have not, and do not, contend that they have placed the issue of breach of duty before the court. Rather, they contend there can be no duty absent foreseeability of the risk. For purposes of this appeal, we assume that appellant could produce expert testimony that Dr. Willke breached his duty of ordinary care by giving Fisher the transfusions.

state the question in this manner is merely to make use of other words to ask it, and can of course provide no answer. *Whether there is to be such legal responsibility is a matter of policy,* of the end to be accomplished; and when we say, for example, that the defendant is or is not under a *'duty'* to protect the plaintiff against such consequences, 'duty' is only a word with which we state our conclusion, and no. more. But at least to deal with the problem in terms of causation, or to talk of the 'proximate,' is merely to obscure the issue." (Emphasis added; citations omitted.) Prosser & Keeton, *supra,* Section 43, at 280–281.

As Prosser & Keeton notes, some courts deal with the policy decision of placing some limitation upon the actor's responsibility for the consequences of her conduct by focusing upon foreseeability in the context of "duty," while others do so under the rubric of "proximate cause." *Id.,* Section 42, at 264; Section 42, at 273. See, also, Section 42, at 274:

"It is quite possible to state every question which arises in connection with *'proximate cause'* in the form of a single question: was the defendant under a *duty* to protect the plaintiff against the event which did in fact occur? Such a form of statement does not, of course, provide any answer to the question, or solve anything whatever; but it may be helpful since 'duty'—also a legal conclusion—is perhaps less likely than 'proximate cause' to be interpreted as if it were a policy-free factfinding. Thus, 'duty' may serve to direct attention to the *policy issues* which determine the extent of the original obligation and of its continuance, rather than to the mechanical sequence of events which goes to make up causation in fact. The question whether there is a duty has most often seemed helpful in cases where the only issue is in reality whether the defendant stands in any such relation to the plaintiff as to create any legally recognized obligation of conduct for the plaintiff's benefit. Or, reverting again to the starting point, whether the interests of the plaintiff are entitled to legal protection at the defendant's hands against the invasion which has in fact occurred. Or, again reverting, whether the conduct is the 'proximate cause' of the result. *The circumlocution is unavoidable, since all of these questions are, in reality, one and the same.* " (Emphasis added.)

■ Believing as Prosser & Keeton does that the question of foreseeability determinations is but a manner of addressing the limits of an actor's legal responsibility, regardless of whether the analysis is conducted under the element of duty or proximate cause, we note that it is more important to recognize the policy nature of our decision than to place special emphasis on the locus of the analysis.

■ In the absence of a legislative pronouncement, the Supreme Court of Ohio is the arbiter of public policy regarding limits of an actor's liability for his

conduct. When the Supreme Court has clearly spoken on a public policy issue, this court may not, in the guise of interpreting or distinguishing such a position, take an opposing view.

The issue of the nature and scope of foreseeability in Ohio negligence law has been determined by the Ohio Supreme Court. Foreseeability is determined by whether a reasonably prudent person would have anticipated that *an injury* was likely to result from the performance or non-performance of the act. *Menifee v. Ohio Welding Products, Inc.* (1984), 15 Ohio St.3d 75, 77, 15 OBR 179, 180–181, 472 N.E.2d 707, 710.

In this case, it is undisputed that appellees could not foresee that an unnecessary platelet transfusion would result in Fisher's receiving the AIDS virus. However, as appellant correctly points out, the well-settled rule in Ohio is that a defendant need not anticipate the particular harm or the severity of the injury that results from the negligent act. Instead, it is sufficient that *an* injury was reasonably foreseeable. *Mussivand, supra,* 45 Ohio St.3d at 321, 544 N.E.2d at 272–273; *Strother, supra,* 67 Ohio St.2d at 287, 21 O.O.3d at 180–181, 423 N.E.2d at 470–471; *Mudrich v. Std. Oil Co.* (1950), 153 Ohio St. 31, 39, 41 O.O. 117, 121, 90 N.E.2d 859, 863–864; *Jeanne, supra,* 74 Ohio App.3d at 252, 598 N.E.2d at 1177–1178. As the Supreme Court of Ohio has stated:

" '[I]f an event causing injury appears to have been *closely related* to the danger created by the original conduct, it is regarded as within the scope of the risk, *even though,* strictly speaking, *the particular injury would not* have been expected by a reasonable man in the actor's place. 2 Restatement of the Law, Torts, 2d, 7, Elements of a cause of action for Negligence, Section 281, Comment g.' " (Emphasis added.) *Strother, supra,* 67 Ohio St.2d at 287–288, 21 O.O.3d at 181, 423 N.E.2d at 471, quoting *DiGildo v. Caponi* (1969), 18 Ohio St.2d 125, 130, 47 O.O.2d 282, 285, 247 N.E.2d 732, 735–736.

Appellant has submitted sufficient evidence to establish that an injury was foreseeable from a negligent transfusion. The deposition of Dr. Willke, as well as the affidavit of Dr. Merz, conclusively establish many blood-related diseases, including hepatitis, a potentially fatal virus, could be transmitted via a blood or platelet transfusion. The particular injury in this case, AIDS, is obviously closely related to the type of dangers created by the allegedly negligent original conduct.

As appellant points out, this decision is in accord with other courts that have faced this precise issue. *Doe v. United States* (D.R.I.1990), 737 F.Supp. 155 (even if AIDS was not foreseeable when transfusions were given as a result of a negligently performed tonsillectomy, appellees could still be liable because other deadly blood diseases were foreseeable); *Gaffney v. United States* (Apr. 26, 1990), D.Mass. No. 88–1457–Z, unreported, 1990 WL 57625 (although AIDS not

foreseeable, other blood diseases were). Although appellees attempt to distinguish these cases on the grounds that they are from other jurisdictions and rely on notions of foreseeability different from Ohio law, we are not persuaded. Both decisions are based on the principle that the particular injury need not be foreseeable—the same rule adopted by Ohio courts. Likewise, appellees' reliance on *Kozup, supra*, is misplaced. Without expressly holding so, that court apparently applied a standard which required appellant to establish that appellees knew about the specific injury which was at risk. As noted above, the Ohio Supreme Court has held otherwise. Furthermore, in *Kozup*, it was undisputed that the tainted blood transfusion was completely necessary for the patient, *i.e.*, the mere act of giving the transfusion did not breach the standard of care. As a result, that case is not persuasive authority for appellees' position.

■ Finally, the appellees claim a decision in favor of the appellant would require physicians to be omniscient and to anticipate inconceivable results. However, as stated above, although a defendant may be liable for resulting injuries that were not specifically foreseeable, the injury still must be "closely related" to the type of danger created by the original conduct, *i.e.*, there is no unlimited liability. Furthermore, foreseeability of consequences, or, as it is sometimes called, the risk of harm, is only one of the factors which are important in determining negligence. Into the scales with it must also be thrown the gravity of the harm if it is to occur, and against both must be weighed the utility of the challenged conduct. See Prosser & Keeton, *supra*, at Section 31. Thus, we do not believe our decision places unjustified responsibilities on physicians, since between an entirely innocent plaintiff and a defendant who has been negligent, the burden of loss due to consequences beyond a known, but closely related, risk should fall upon the wrongdoer.

Accordingly, the judgment of the trial court is reversed and this case is remanded for further proceedings consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

PETER B. ABELE, J., concurs.

STEPHENSON, J., dissents.

STEPHENSON, Judge, dissenting.

I respectfully dissent. While I agree that the principal opinion correctly states the applicable law on the question of foreseeability, I do not concur in its wooden application to the facts presented in the cause *sub judice*. It is undisputed that AIDS was not a foreseeable risk of a platelet transfusion in 1980. See, generally, *Kozup, supra*, 663 F.Supp. at 1051–1053. There are no doubt many diseases yet

414

unknown to medical science which await discovery in the future. To hold a physician liable for unforeseeable consequences or diseases unknown to medical science is to, in effect, adopt a public policy of making the physician an insurer. I decline to join my colleagues in what is, in my view, an illogical and unconscionable result. Hence, my dissent.