**KATTERHENRICH, Appellant,**

v.

**FEDERAL HOCKING LOCAL SCHOOL DISTRICT BOARD OF EDUCATION, Appellee.**

[Cite as *Katterhenrich v. Fed. Hocking Local School Dist. Bd. of Edn.* (1997) 121 Ohio App.3d 579.]

Court of Appeals of Ohio,
Fourth District, Athens County.

No. 96CA1752.

Decided June 11, 1997.

580

582

*Cloppert, Portman, Sauter, Latanick & Foley* and *William J. Steele*, for appellant.

*Mollica, Gall, Sloan & Sillery Co., L.P.A.* and *Robert J. Gall*; and *Birgit Pedersen*, Athens County Assistant Prosecuting Attorney, for appellee.

STEPHENSON, Presiding Judge.

This is an appeal from a July 12, 1996 judgment of the Court of Common Pleas of Athens County granting summary judgment against David Katterhenrich, plaintiff below and appellant herein, on Katterhenrich's claims for declaratory and injunctive relief and damages, arising from the failure of the Federal Hocking Local School District Board of Education, defendant below and appellee herein, to hire him as an assistant boys' basketball coach. Appellant assigns the following errors for our review:

I. "The court below erred in holding that the Board of Education did not violate Ohio's Open Meeting Act because there is a material question of fact as to whether the board properly provided notice of its November 8, 1994 meeting."

II. "The court below erred in holding that plaintiff–appellant failed to establish a claim for intentional infliction of emotional distress."

III. "The court below erred in holding that the Board of Education followed the proper procedure for hiring a noncertified individual as assistant boys' basketball coach."

IV. "The court below erred in holding that plaintiff was not deprived of his liberty interest in his good name and professional reputation."

V. "The court below erred in holding that defendants–appellees did not base their failure to hire plaintiff–appellant as assistant boys' basketball coach upon plaintiff–appellant coaching his own son."

The record reveals the following facts pertinent to this appeal. Appellant, David Katterhenrich, is a teacher with the Federal Hocking Local School District. In the fall of 1994, when the Federal Hocking Local School District Board of Education ("board") began considering candidates for various coaching positions, appellant applied for the position of assistant boys' basketball coach. The position involved coaching the seventh grade boys' basketball team.

After applying for the position, appellant was approached by the athletic director, John Cleland, who indicated that there were complaints about the fact that appellant would be coaching his own son. Cleland asked appellant whether he would, therefore, consider coaching the eighth grade team. Appellant indicated that he would.

At the October 20, 1994 meeting of the board, several coaching vacancies were filled. Consideration of appellant's name, however, was tabled. On November 1, 1994, a special meeting of the board was held. At this meeting, Rocky Brunty, a noncertificated individual, was hired as eighth grade boys' basketball coach. On November 8, 1994, another special meeting was held, in which the board rescinded the earlier resolution hiring Rocky Brunty. A new resolution was passed, which provided as follows:

"WHEREAS, this Board has posted the position of Assistant Boy's [sic] Basketball Coach as being available to employees of the district who hold teaching certificates, and no such employee meeting all of the Board's qualifications has applied for, been offered, and accepted such position, and

"WHEREAS thisBoard [sic] then advertised this position as being available to certificated individuals not employed by this district, and no such person has applied for, been offered, and accepted such position,

"BE IT THEREFORE RESOLVED, that Rocky Brunty, a noncertificated individual be employed as an Assistant Boy's [sic] Basketball Coach for the 1994–95 school year.

"Vote: Mr. Butcher, yes; Mr. Koehler, yes; Mr. Young, yes; Mr. Jarvis, Absent; and Rev. Bennett, yes."

On February 21, 1995, appellant filed suit against the board and the board's five members, individually and in their official capacities. Appellant set forth six causes of action: (1) violation of R.C. 3313.53 and Ohio Adm. Code 3301–27–01; (2) violation of R.C. 121.22 et seq.; (3) deprivation of his right to due process, equal protection, free association and privacy, guaranteed by the First and Fourteenth Amendments to the United States Constitution; (4) intentional infliction of emotional distress; (5) negligent infliction of emotional distress; and (6) deprivation of his liberty interest in his good name and professional reputation without due process of law under the Fourteenth Amendment to the United

States Constitution. Appellant sought declaratory and injunctive relief as well as damages.

On October 30, 1995, appellees filed a motion for summary judgment, which was granted by the trial court on July 12, 1996. On August 12, 1996, appellant filed notice of the instant appeal, asserting the above-enumerated assignments of error.

■■■ We begin by observing that our analysis of an appeal from a summary judgment is conducted under a *de novo* standard of review. *Coventry Twp. v. Ecker* (1995), 101 Ohio App.3d 38, 41, 654 N.E.2d 1327, 1328–1329; *Doner v. Snapp* (1994), 98 Ohio App.3d 597, 600, 649 N.E.2d 42, 43–44; *Koos v. Cent. Ohio Cellular, Inc.* (1994), 94 Ohio App.3d 579, 588, 641 N.E.2d 265, 271–272. We afford no deference to the trial court's decision, see *Tardy v. Norfolk S. Corp.* (1995), 103 Ohio App.3d 372, 379, 659 N.E.2d 817, 821; *Oiler v. Willke* (1994), 95 Ohio App.3d 404, 407, 642 N.E.2d 667, 669; *Shepherd v. United Parcel Serv.* (1992), 84 Ohio App.3d 634, 641, 617 N.E.2d 1152, 1156–1157, conducting our own independent review to determine whether summary judgment was appropriate. *McGee v. Goodyear Atomic Corp.* (1995), 103 Ohio App.3d 236, 241, 659 N.E.2d 317, 320; *Schwartz v. Bank One, Portsmouth, N.A.* (1992), 84 Ohio App.3d 806, 809, 619 N.E.2d 10, 11–12; *Howard v. Wills* (1991), 77 Ohio App.3d 133, 139, 601 N.E.2d 515, 518–519. Summary Judgment under Civ.R. 56 is deemed appropriate when the movant demonstrates that (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the opposing party, said party being entitled to have the evidence construed most strongly in his favor. See, generally, *Horton v. Harwick Chem. Corp.* (1995), 73 Ohio St.3d 679, 653 N.E.2d 1196, paragraph three of the syllabus; *Bostic v. Connor* (1988), 37 Ohio St.3d 144, 146, 524 N.E.2d 881, 883–884; *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66, 8 O.O.3d 73, 74, 375 N.E.2d 46, 47–48. It is against this analytical framework that we consider each of appellant's assignments of error.

In his first assignment of error, appellant argues that the trial court erred in granting summary judgment because there is a material question of fact as to whether the board properly provided notice of its November 8, 1994 meeting. We disagree.

R.C. 121.22, commonly referred to as the "Sunshine Law," requires that a meeting of the board be open and public. The statute specifically invalidates any resolution, rule or formal action of the board adopted other than in an open meeting. R.C. 121.22(H). The statute also, with limited exceptions, invalidates any resolution, rule or formal action of the board adopted in an open meeting if deliberations resulting in the adoption were conducted other than in an open

meeting. *Id.* Additionally, the statute invalidates any resolution, rule, or formal action of the board adopted in an open meeting if notice of the meeting is not provided in accordance with the statute's notice provisions. *Id.*

The notice provisions of R.C. 121.22 are embodied in division (F) of the statute, which provides as follows:

"Every public body shall, by rule, establish a reasonable method whereby any person may determine the time and place of all regularly scheduled meetings and the time, place, and purpose of all special meetings. A public body shall not hold a special meeting unless it gives at least twenty-four hours' advance notice to the news media that have requested notification * * *."

In accordance with this statute, the board promulgated the following rules, regarding notification:

"NOTIFICATION OF BOARD MEETINGS

"Due notice of all official meetings of the Board shall be given widest possible dessemination [*sic*] through the available media.

"Except in case of emergencies, this shall be interpreted to mean that the notification for all special and/or rescheduled meetings shall be sent to the media in time for the public to be notified at least 24 hours in advance. All Board members are to be notified as early as possible of special meetings.

"Dates of regular meetings of the Board shall be decided at the annual organizational meeting. These dates, time and place shall be announced in the media and be available in printed form to the public."

"SCHOOL BOARD MEETINGS .

"SPECIAL MEETINGS—A special meeting may be called by the president or treasurer or by any two members, by serving a written notice of the time and place of such meeting upon each member of the Board at least two days prior to the date of such meeting. Such notice must be signed by the official or members calling the meeting. For the purposes of this policy, service by mail is good service.

"A special meeting cannot be held unless a twenty-four hour advance notice is given to the news media, that have requested notification, except in acase [*sic*] of an emergency requiring immediate official action. In the event of such an emergency, the member or members calling the meeting shall notify such news media immediately of the time, place and purpose of the meeting."

Appellant argues, in essence, that these rules, as well as R.C. 121.22(F), require the same method of notice for both regular and special meetings. The board, on the other hand, argues that R.C. 121.22(F) and the board's notification

rules require notice of special proceedings to be given only to news media that have requested notification. We find both parties' arguments to be misguided.

Beginning with the terms of the statutory provision, we quote the following language of the Ohio Attorney General, which, we believe, appropriately outlines the statute's notice requirements:

"The requirements for notification will differ depending upon the type of meeting that has been called. * * * [T]he Open Meetings Act distinguishes between 'regular' and 'special' meetings. Regular meetings are those which are held at prescheduled intervals. Such meeting would include, for example, monthly or annual meetings. * * * With respect to such meetings, R.C. 121.22(F) requires that each public body establish, by rule, 'a reasonable method whereby any person may determine the time and place' of the meetings. In addition, where a person so requests and pays a reasonable, fee, the rule must also provide for the 'reasonable advance notification of all meetings at which any *specific type of business* is to be discussed.' [Emphasis *sic.*] Such notification may include the sending of the meeting's agenda to persons requesting notice. *Id.*

 "While the term 'special meeting' is not defined in R.C. 121.22, its use in context indicates that a reference to all meetings other than 'regular' meetings was intended. With respect to special meetings, R.C. 121.22(F) requires that the public body establish, by rule, 'a reasonable method whereby any person may determine the time, place, *and purpose*' of the meeting. [Emphasis *sic.*] In addition, the public office is required to give at least 'twenty-four hours' advance notice to the news media that have requested notification, except in the event of an emergency requiring official action.' Once again, the rule must also provide for the 'reasonable advance notification of all meetings at which any specific type of business is to be discussed.'" 1988 Ohio Atty.Gen.Ops. No. 88–029, at 2–121 to 2–122.

As observed by the Attorney General, R.C. 121.22 distinguishes between "regular" and "special" meetings. The very nature of these two categories of meetings, which we believe accounts for the statutory distinction in the required *substance* of the notices, counsels against the conclusion that a single *method* of notice, applicable to both types of meetings, is mandated by the statute.

Typically, one would expect regular meetings to be scheduled well in advance, as in the case *sub judice,* where the board's regular meetings are scheduled each year at a January organizational meeting. Special meetings, on the other hand, typically called to address some particular matter or matters of immediate concern, one could well expect to be scheduled on much shorter notice, perhaps only a day or so ahead of time, depending on the exigencies of the situation. This

being the case, it is obvious that what might be a reasonable form or method of notice in the context of a special meeting may well not be reasonable with respect to a regular meeting. This is not to say that separate methods of notice are necessarily required, but merely that we do not believe the statute prohibits, *per se*, such practice.

■ Having said the above, we are compelled to point out the fallacy in the board's argument. The board argues that the statute requires no notice of a special meeting aside from "at least twenty-four hours' advance notice to the news media that have requested notification." [1] This is not so.

First, the statute requires that "[e]very public body * * *, by rule, establish a reasonable method whereby any person may determine * * * the time, place, and purpose of all special meetings." The board's argument completely ignores the plain language of the statute.

Second, the board's interpretation of the statute makes notice of many meetings entirely contingent upon whether the media decides to request notice. Indeed, in the case *sub judice*, the record reflects that *no* media had *ever* requested notification. Thus, according to the board, no notice, of any type, to anyone, was required. The notice given to The Athens Messenger was merely gratuitous.

■ We are not persuaded that the General Assembly intended that the public should have to rely upon the desires of the media or the sheer benevolence of the board in order to be notified of any meeting of the board. A rule requiring only "twenty-four hours' advance notice to the news media that have requested notification" fails, as a matter of law, to establish a "reasonable method of notice" as required by R.C. 121.22(F).

■ Notwithstanding our rejection of appellees's interpretation of R.C. 121.22(F), we find that the board's notification rule does, in fact, comply with the terms of the statute. The rule promulgated by the board requires that due notice of "all official meetings" of the board be given the "widest possible" dissemination through the "available" media. We construe this language to require more than a mere twenty-four hours' notice to the news media that have requested notification. Indeed, the record reflects that Cindy Rhonemus, the

---

1. We note that the statute's media notice requirement is not restricted solely to notice of special meetings. The media notice requirement applies to *"all* meetings at which any specific type of public business is to be discussed." (Emphasis added.) R.C. 121.22(F). We realize, as a practical matter, that many regular meetings are not held for a specific reason, but, rather, are held simply because they are regularly scheduled meetings. We can, however, envision instances in which the public body will be aware that a specific type of public business is to be discussed at an upcoming regular meeting.

school district treasurer who is responsible for notices of special meetings, believed that the school district was required, by statute, to provide notice to *at least* one form of media. Moreover, appellant agrees that "[o]n their faces, [the] policies appear to be a good faith attempt to comply with 'The Sunshine Law.'" While we think it would behoove the board to promulgate a more definitive rule or set of rules, we find that the board's rules establish a reasonable method of notice as contemplated by the statute.

■ Having concluded that the language of the board's rules is sufficient to comply with the statute, we now turn to appellant's argument that appellees violated these rules in notifying only The Athens Messenger. Appellant argues that notifying The Athens Messenger "is hardly the 'widest possible dissemination through the available media.'" Appellant does not, however, direct us to any evidence in the record to support this position. In light of the undisputed fact that the board provided notice of the hearing to the local newspaper, appellant was required to set forth affirmatively specific facts showing a genuine issue of material fact regarding the reasonableness of this notice. Appellant has not done so. Accordingly, appellant's first assignment of error is overruled.

In his second assignment of error, appellant contends that the trial court erred in granting summary judgment on his claim for intentional infliction of emotional distress. Appellant argues that there is sufficient evidence to submit the claim to a jury. We disagree.

■ In order to establish an action for the intentional infliction for emotional distress, a plaintiff must show (1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; (2) that the actor's conduct was so extreme and outrageous as to go "beyond all possible bounds of decency" and was such that it must be considered as utterly intolerable in a civilized community; (3) that the actor's actions were the proximate cause of plaintiff's psychic injury; and (4) that the mental anguish suffered by plaintiff is serious and of a nature that no reasonable person could be expected to endure it. See *Yeager v. Local Union 20* (1983), 6 Ohio St.3d 369, 6 OBR 421, 453 N.E.2d 666, syllabus; *Steiner v. Steiner* (July 12, 1995), Scioto App. No. 93CA2191, unreported, 1995 WL 416941.

■ In regard to the fourth element, the Supreme Court of Ohio has made clear that "in order to state a claim alleging the intentional infliction of emotional distress, the emotional distress alleged must be serious." *Yeager*, 6 Ohio St.3d at 374, 6 OBR at 425, 453 N.E.2d at 671. The court, in *Paugh v. Hanks* (1983), 6 Ohio St.3d 72, 78, 6 OBR 114, 119, 451 N.E.2d 759, 765, defines "serious," in the context of emotional distress, as follows:

"By the term 'serious,' we of course go beyond trifling mental disturbance, mere upset or hurt feelings. We believe that serious emotional distress describes emotional injury which is both severe and debilitating. Thus, serious emotional distress may be found where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case.

"A non-exhaustive litany of some examples of serious emotional distress should include traumatically induced neurosis, psychosis, chronic depression, or phobia."

 In his complaint, appellant alleged "humiliation, serious emotional distress [and] loss of self-esteem." However, the record in this matter affirmatively establishes that appellant does not suffer emotional distress of the magnitude necessary to sustain a viable claim for intentional infliction of emotional distress. In regard to the issue of his emotional distress, appellant testified in his October 10, 1995 deposition that since November 1994, he has continued to teach, to drive a car, and to be a father and husband. He now performs more household chores than before the incident of which he complains and, "outwardly," is operating normally. He is able to do the normal things that he would have done before 1994. In fact, appellant testified that he applied for, and was given, the position of junior high football coach for the 1994–1995 school year. Additionally, appellant testified that he has seen his family doctor and has spoken to his pastor, but that he has not sought treatment from a psychologist or psychiatrist.[2] Appellant's deposition testimony clearly shows that appellant does not suffer from emotional injury which is "both severe and debilitating."

 Additionally, we note that to support a cause of action for intentional infliction of emotional distress the board's conduct would have to be so extreme and outrageous as to go "beyond all possible bounds of decency" and be such that it must be considered as utterly intolerable in a civilized community. In regard to this element, we have previously observed:

"The social context as well as the relationship between the parties * * * appears to be an important fact. The work environment, for example, is one in which employees must expect to be evaluated, not always favorably; thus questioning, criticism, and discharge of an employee do not constitute outrageous conduct." *Johnson v. Cox* (Mar. 28, 1997), Adams App. No. 96CA622, unreport-

---

2. We note that appellant executed an affidavit on March 26, 1996, in response to the board's motion for summary judgment, in which appellant averred that "he has sought psychiatric counseling to cope with the stress created by the Board's action." We give appellant the benefit of the doubt, assuming that he sought psychiatric counseling between the time of his deposition and the execution of the affidavit.

ed, 1997 WL 152636, citing Prosser & Keeton, The Law of Torts (5 Ed.1984) 62, Section 12.

Accordingly, we find, based upon the record before us, that the Board's "exclusion of [appellant,] a qualified certificated candidate[,] in order to hire a noncertificated individual" does not, as a matter of law, constitute extreme and outrageous conduct. Accordingly, appellant's second assignment of error is overruled.

In his third assignment of error, appellant argues that the board failed to follow the statutory procedure for hiring a noncertificated individual as assistant boys' basketball coach. Appellant first asserts that the procedure employed by the board in this case was flawed because the board had no standard by which it could determine whether appellant was unqualified for the position. We disagree.

R.C. 3313.53(B) provides as follows:

"The state board [of education] shall * * * adopt rules applicable to licensed individuals, setting forth standards to assure any such individual's competence to direct, supervise, or coach a pupil-activity program and that shall not be more stringent than the standards set forth in rules applicable to nonlicensed individuals."

The statute clearly provides that an applicant must meet standards adopted by the State Board of Education. The Department of Education adopted standards governing "qualifications to direct, supervise, or coach a pupil-activity program" in Ohio Adm.Code 3301–27–01. This section provides:

"The board of education of any city, exempted village, or local school district upon recommendation of its superintendent may employ, pursuant to applicable law, an individual to direct, supervise, or coach a pupil-activity program provided such individual meets the following qualifications.

"* * *

"(B) Whether certificated or noncertificated, the individual is competent to direct, supervise, or coach a pupil-activity program as evidenced by:

"(1) The ability to work effectively with pupils as documented by recent successful experience as determined by the board of education.

"(2) Knowledge of the activity program as documented by:

"* * *

"(b) Successful experience, as determined by the board of education, in such activity program."

Thus, contrary to appellant's contention, there existed standards by which the board could determine whether he was a qualified applicant. Additionally, we note that the record before us contains an excerpt from the Federal Hocking Local School District coaches' handbook entitled "Job Description for Assistant Coaches," which the board adopted in 1993. This section of the handbook outlines the qualifications for assistant coaches.

■■■ The record does not indicate that any of the board members were aware of Ohio Adm.Code 3301–27–01. Further, the record reflects that the board members were not familiar with the exact qualifications outlined in the coaches' handbook. However, a review of the record reveals that the members of the board evaluated appellant based upon substantially the same standards as are outlined therein. Accordingly, we reject appellant's argument that the board had no standard by which it could determine that he was unqualified.

■■■ Appellant next asserts that the board failed to follow the proper procedure because the board was required to have the recommendation of the superintendent in order to hire a noncertificated individual such as Rocky Brunty. We agree with appellant that Ohio Adm.Code 3301–27–01 contemplates a superintendent's recommendation. However, we find that appellant has demonstrated no prejudice arising from the failure of the board to obtain the superintendent's recommendation for Brunty.

R.C. 3313.53 sets out the procedure for the filling of coaching positions. A coaching position must first be offered to licensed district employees. If no such employee *qualified* to fill the position accepts it, the position may then be offered to licensed individuals outside the district. If no such licensed individual *qualified* to fill the position accepts it, the position may then be offered to nonlicensed individuals.

Pursuant to this procedure, the board first evaluated appellant, the only licensed district employee applicant. After determining that appellant was unqualified, the board then progressed through the next levels in the hiring process. Once appellant was found to be unqualified in accordance with this process, any alleged procedural error in the consideration and hiring of another individual simply has no bearing on appellant. Accordingly, appellant's third assignment of error is overruled.

In his fourth assignment of error, appellant argues that the board's decision that he is "unqualified" to coach boys' eighth grade basketball has deprived him of his liberty interest in his good name and professional reputation. We disagree.

"The concept of 'liberty' [as guaranteed by the Fourteenth Amendment] recognizes two particular interests of a public employee: 1) the protection of his or her good name, reputation, honor and integrity; and, 2) his or her freedom to

take advantage of other employment opportunities." *Sullivan v. Brown* (C.A.6, 1976), 544 F.2d 279, 283, citing *Bd. of Regents of State Colleges v. Roth* (1972), 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548.

The Supreme Court, in *Roth*, 408 U.S. at 573, 92 S.Ct. at 2707, 33 L.Ed.2d at 558, recognized that "[t]here might be cases in which a State refused to reemploy a person under such circumstances that interests in liberty would be implicated." [3] The court, however, observed that "[i]t stretches the concept too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains as free as before to seek another." *Id.* at 575, 92 S.Ct. at 2708, 33 L.Ed.2d at 560.

In the instant case, appellant's deposition testimony reveals the following:

■ "Q. * * * Is there anything other than the articles and the radio statements [which appeared after this lawsuit was commenced] [4] that you point to [to] say that your good name and professional reputation were damaged?

"A. Well, the coaches in the area—the staff and the other coaches couldn't believe that this was happening.

"Q. That you didn't get the job?

"A. Yeah, that I wasn't hired.

"Q. But at least until the lawsuit was filed the Rev. Bennett and other members of the board had not made public statements that you were. . . .

"A. No, it was just the procedures up to this point. The way they were done.

"Q. So, basically, what—before the lawsuit was filed it was the fact that you did not get the job? Just the fact you didn't get the job?

---

**3.** In determining that no liberty interests were implicated in the case before it, the *Roth* court looked to such factors as whether the state had made any charges against the respondent that might seriously damage his standing and associations in the community, (for example, that he had been guilty of dishonesty or immorality) or whether the state, in declining to reemploy the respondent, imposed on him a stigma or other disability foreclosing his freedom to take advantage of other employment opportunities (for example, invoking any regulations to bar the respondent from all other public employment in state universities).

**4.** Appellant's deposition indicates that *after* the institution of the instant action, newspaper articles and radio spots quoted one of the Board members as saying that appellant doesn't have the ability to win. On appeal, appellant does not cite to these post-complaint media reports as support for his claim.

In any event, appellant has steadfastly argued that a coach's win-loss ratio is irrelevant to the assessment of that coach's coaching abilities. Appellant would, therefore, be hard-pressed to complain that reference to his win-loss ratio would be prejudicial to him.

"A. Yeah, I didn't get it and the kids were tellin' my kids, 'Hey, I thought your dad was goin' to be the coach.' Everybody knew that the guy that got it never applied for it.

"Q. So it [sic] terms of the damage to your good name and professional reputation before the lawsuit was filed, it was basically that you didn't get the job and the kids in the district were telling your kids that you didn't get the job?

"A. Yeah, some of them.

"Q. Okay. Before the lawsuit was filed there were no public statements from the board or the administration having to do with your ability to win or not win. Correct?

"A. No.

"Q. Okay. Before—correct?

"A. Correct.

"* * *

"Q. Okay. The board and the members of the board had never accused you of any immoral behavior?

"A. No.

"Q. They had never accused you of any illegal behavior?

"A. No.

"Q. Do you have any information that suggests they sent information about you to other school districts?

"A. Do I have any information? No.

"Q. Before the lawsuit do you have any information that they sent any information about you to the press?

"A. Before the lawsuit was. . . .

"Q. Before the lawsuit was filed?

"A. No. Not about me. About who was hired, I suppose, was in the paper." (Footnote added and ellipsis sic.)

It is clear from the above that the board did not, in declining to give appellant the coaching position, make any charge against him that might seriously damage his good name, reputation, honor or integrity. Further, aside from appellant's assertion that "he is of the belief that [the board's] determination will make it difficult, if not impossible, to obtain future employment as a basketball coach," there is no evidence in the record before us which would support a finding that the board imposed upon appellant a stigma or other disability that would foreclose his freedom to take advantage of other employment opportunities. To

the contrary, the uncontroverted evidence in the record establishes that appellant applied for, and was given by the board, a supplemental coaching contract for the 1995 school year, albeit in junior high football.

Appellant's complaints are premised simply upon the fact that he was not hired for the position he sought. This being the case, appellant has failed to implicate any liberty interest protected by the Fourteenth Amendment. Accordingly, we overrule appellant's fourth assignment of error.

In his fifth and final assignment of error, appellant argues that summary judgment is not appropriate because a genuine issue of material fact exists as to whether the board's refusal to hire him was based upon the fact that he would coach his son. We disagree.

The record before us contains affidavits of four of the five members of the board, as well as the deposition of each of the five members. The affidavits of members Young, Bennett, Koehler, and Butcher state that they "did not consider [appellant] to be qualified to fill the position of assistant boys' basketball coach. [T]hey did not believe he had the ability to work effectively with the basketball players he would have been asked to coach, because his recent experience with coaching basketball in the district had been unsuccessful." Further, each of these four board members states in his affidavit that "[his] decision to vote in favor of the resolution hiring Rocky Brunty was not based in whole or in part upon the possibility that Mr. Katterhenrich might coach his own child."

Board member Bennett testified in his deposition that his objection to hiring appellant was based upon his observations of appellant's coaching practices. Bennett attended practically every game the year that appellant coached reserve boys' basketball and observed the team play with little supervision from appellant. Bennett felt that appellant exhibited a lack of enthusiasm, paying little attention to the boys on the floor. Bennett also felt that appellant's lack of enthusiasm affected his ability to convey his knowledge of basketball to his players.

Bennett also testified that there is no policy which prohibits a coach from coaching his own child. Further, appellant was absolutely not disqualified on this basis.

Board member Young testified that he saw most of the junior varsity games that appellant coached and two or three of the junior high games. Young testified that the players appellant coached did not display even basic skills and showed no improvement as the season progressed. Appellant did very little coaching during the games.

Young testified that there is no policy prohibiting a coach from coaching his own son or daughter. In fact, the district has had numerous coaches coach their own children.

Board member Jarvis testified that he had seen a few football games coached by appellant, but had not seen any of appellant's basketball games. Jarvis was not present at the November 8, 1994 meeting of the board, when Rocky Brunty was hired for the position appellant sought. Jarvis was, however, present at the October 20, 1994 meeting, at which appellant's name was tabled. At that meeting there was a discussion regarding whether appellant was qualified for the position. The discussion centered primarily around whether appellant could convey his knowledge of the sport of basketball to team members and motivate them on the court. Because he was unfamiliar with appellant's basketball coaching, Jarvis relied strongly on the opinion of the other board members.

Jarvis testified that there is no policy prohibiting a coach from coaching his own child. In fact, appellant had previously coached his own son in football. That would not have been a consideration. Jarvis acknowledged that the issue was mentioned briefly at the meeting, but was shot down the moment it was presented. Jarvis can firmly say that the issue had no effect on the decision to table appellant's name.

Board member Butcher testified that he had not observed appellant coach basketball. He had observed appellant coach football and he had obtained information during frequent meetings held with coaches and assistant coaches. Butcher felt that appellant was not qualified based upon his past win-loss record.[5] When observing appellant as a football coach, Butcher did not see good management of the boys on the team. The necessary leadership was not there.

Butcher is not aware of any policy prohibiting a coach from coaching his own son or daughter. There have been previous coaches with relatives on their teams.

Board member Koehler testified that he had not observed appellant coaching basketball. Koehler relied upon the opinions of fellow board members who had seen appellant coach in prior seasons.

In response to appellees' motion for summary judgment, appellant submitted the affidavit of Cathy Brandeberry. Brandeberry's affidavit indicates that she is a Federal Hocking school bus driver and that she has known board member Koehler for approximately four years. In 1994, after appellant was not hired as assistant basketball coach, Brandeberry asked Koehler why appellant had not

---

5. The record reflects that appellant's basketball coaching record at Federal Hocking was nine wins and twenty-seven losses or ten wins and twenty-six losses.

been hired for the position. Koehler replied that "the Board of Education did not want parents coaching their children." [6]

Based upon the Brandeberry affidavit and the fact that Jarvis's deposition indicates that there were some concerns about appellant coaching his own son, appellant argues that a factual question sufficient for consideration by the trier of fact has been created. We are not persuaded.

First, Jarvis's deposition testimony makes clear that while the issue of appellant coaching his own son was mentioned, it was not a determinative factor:

"My recollection is it was a statement that was made and immediately a counter statement was made, well, other coaches coach their own sons. In fact, Mr. Katterhenrich has coached his own son in the past. So it was just, like I said, it was just input, someone had provided that input, and it was, you know, I think in a general sense shot down the moment it was presented."

Second, concerns about appellant coaching his son initially arose when appellant applied for a position involving the seventh grade team, of which appellant's son would apparently be a member. For this very reason, appellant agreed to withdraw his name from consideration as seventh grade coach and to seek the eighth grade position instead. The possibility of appellant coaching his own child was apparently mentioned at the board's October 20, 1994 meeting. However, as the May 3, 1996 affidavit of board member Young makes clear, the eighth grade position for which appellant was being considered simply did not involve the possibility of appellant coaching his son.

We do not believe therefore, that a genuine issue of material fact exists as to whether the board refused to hire appellant based upon the fact that he would coach his own son. Accordingly, appellant's fifth assignment of error is overruled.

Having considered the errors assigned and argued in the briefs and finding none to be of merit, we affirm the decision of the lower court.

*Judgment affirmed.*

KLINE, J., concurs.

HARSHA, J., concurs in part and dissents in part.

---

6. Koehler testified in his deposition, however, that he had never made a statement to anyone that one of the reasons appellant was not hired was the fact that he might coach his son.

HARSHA, Judge, concurring in part and dissenting in part.

I concur in judgment and opinion with the majority concerning the second, third, fourth, and fifth assignments of error. However, I must respectfully dissent from the disposition of the first assignment of error because I believe the record establishes a genuine issue of material fact concerning the appellees' compliance with its own notification rule. This rule requires "the widest possible dissemination through the available media." The majority concludes that the appellant failed to raise specific facts to establish a genuine issue regarding the reasonableness of sending notice only to The Athens Messenger. I believe the appellees' own summary judgment evidence raises such a factual question. Specifically, the affidavit of Cindy J. Rhonemus, filed in support of appellees' motion, contains a list of people and organizations to whom notice of the regular meeting was sent. This list establishes that in addition to The Athens Messenger, there are three other newspapers and three radio stations serving the community. Thus, I believe the existence of these additional media sources raises a genuine issue of material fact concerning the reasonableness of notifying only The Athens Messenger about the special meeting. Reasonable minds could clearly disagree about this notice satisfying the rule requiring the "widest possible dissemination." Thus, I dissent.