David A. PERRINE, et al., Plaintiffs,

v.

MPW INDUSTRIAL SERVICES, INC., Defendant.

Case No. C2–00–639.

United States District Court, S.D. Ohio, Eastern Division.

July 18, 2002.

David A. Perrine, Pro Se.

Debra Perrine, Pro Se.

David Anthony Kadela, Littler Mendelson PC–2, Columbus, OH, for MPW Industrial Services, Inc.

## OPINION AND ORDER

MARBLEY, District Judge.

This matter is before the Court on Defendant's motion for summary judgment filed on December 18, 2001. Oral arguments were heard on June 27, 2002. For the following reasons, the Court **DENIES** the motion as to Plaintiffs' intentional tort claim; **DENIES** the motion as to Plaintiffs' retaliatory discharge claim; **DENIES** the motion as to Plaintiffs' violation of public policy claim; **DENIES** the motion as to Plaintiffs' loss of consortium claim; and **GRANTS** the motion as to each of Plaintiffs' other claims.

### I. STATEMENT OF FACTS

Plaintiff David A. Perrine ("Perrine") is a former employee of Defendant MPW Industrial Services, Inc. ("MPW" or "the Company"), which is engaged in the busi-

ness of providing industrial cleaning, water purification, and waste handling systems to its customers. Defendant operates two facilities in Ohio, including its 500–person headquarters in Hebron, and an industrial water plant in Newark, which employs twenty-one people.

MPW hired Perrine in January 1995 as a fabricator who was responsible for welding and equipment construction. Initially, Perrine worked at MPW's Hebron facility. While there, he received a copy of the Company's employee handbook, which provided, *inter alia*, that his employment was at-will. Additionally, while at the Hebron facility, the Company claims that it provided Perrine with safety training and instruction regarding various issues, including communications on hazardous conditions, respirator protection and operation, personal protective equipment and the lock-out/tag-out procedures.

After a temporary assignment to the Newark facility in June 1997, Perrine petitioned for a permanent transfer to the Newark facility. By January 1998, MPW granted Perrine's request and he began working as a full-time fabricator in Newark. The Newark facility has two primary buildings, one known as the regeneration building and the other known as the fabrication building. By March 1999, Perrine and several of his co-workers were operating out of the fabrication building, which was added in December 1998. Perrine estimates that he spent approximately 50% of his time in each building between December 1998 and May 1999. While working at the Newark facility, Perrine reported to Don Gomez ("Gomez"), his immediate supervisor, and also had contact with Dale Swoop ("Swoop"), the plant manager.

In Perrine's January 1999 performance review, Swoop informed Perrine that he was having attendance problems, which needed to stop. Perrine acknowledges his absences, but attributes them to a medical condition developed while working at the Newark facility. On May 13, 1999, Perrine reported to work for the last time. Perrine apparently filed a workers' compensation claim with his doctor, Richard Simon ("Dr. Simon"), on that day as well, although the claim was not officially filed until after the termination of his employment. Perrine claims that this was due to technical difficulties in the filing process.

Four days later, on May 17, 1999, Perrine faxed a signed note from his doctor to MPW informing the Company that he would not return to work for two weeks for medical reasons. The following day, Perrine met with Swoop, Dale Campion, the facility's General Manager, and Patrick O'Rourke, the facility's Human Resources Director, to discuss his absences. Perrine was informed that he would need to contact Swoop directly in the future with regard to any absences, and that he would need to make arrangements with his physician to provide MPW with information regarding his medical condition and its expected duration. In response to the meeting with the facility leadership, Perrine released his medical records on June 10, 1999. It is unclear whether the records were ever given to MPW after their release, or whether Swoop or Gomez ever contacted Perrine's doctor to discuss Perrine's condition between late May and June 1999. Following the May 1999 meeting, Perrine's communication with MPW diminished. He faxed several medical excuses to the Company, but other than a conversation with Swoop on June 7, 1999, and possibly one or two additional conversations with other MPW employees, his communications with the Company essentially ended.

In June 1999, Perrine filed a formal complaint with the Occupational Safety and Health Administration ("OSHA") re-

garding the working conditions at the Newark facility. Perrine claims that he was exposed to the fumes and residue of hazardous chemicals such as hydrochloric acid and caustic soda on a daily basis. For instance, his workstation was next to a chemical storage tank that was known to leak. As a result of the leaks, Plaintiff claims that there was a regular flow of acids and caustic soda into his work area and that he was "constantly in chemicals." Perrine contends that each night the chemical fumes would condense on his equipment, and by the morning, "it would be dripping a green hydrochloric acid off of the saws." Due to the acidic condensation, Perrine states that "when you'd open the doors in the morning, you could see the smoke going out of the doors from where it had been laying there eating the [steel/wood] particles that I'd have accumulated from my work. They would dissolve, bubble, and create a smoke; and the smoke would billow out of the bay windows when you'd open them in the mornings." Finally, Perrine claims that on three or four occasions during the course of his employment at the Newark facility the chemical tanks near his work station overflowed, spilling their contents onto the floor and filling the building with acidic fumes, which caused the employees to run outside to breathe.[1] Plaintiff maintains that he and other employees complained to their supervisors about the work conditions and hazards.

Plaintiff asserts that MPW failed to provide him with effective safety training and necessary protective equipment. He states that he received only one safety class long before he began working at the Newark facility. In the presentation, which used placards, the Company identified a respirator and pointed out some hazards of working around chemicals. Perrine alleges that the class was cursory, and that because the answers were provided to him before hand, the subsequent test was simply a paper drill. Furthermore, Plaintiff asserts that the only protective equipment he ever saw, until very late in his employment when he was provided a welding mask with a respirator, was a pair of old, broken-down protective suits that were never used and remained in a closet. Perrine claims that MPW refused to provide him with proper protective gear, and denied his request for gloves to protect his hands.

In response to a complaint filed by Perrine, OSHA inspected the MPW Newark facility on July 2, 1999, and found that 10–12 employees were exposed to the following hazardous conditions: (1) contact with hydrochloric acid (HCL) due to leaking equipment; (2) inhalation of HCL fumes due to a lack of respirators;[2] (3) a lack of gloves, face shields, and goggles for employees working with HCL and other caustics; and (4) no hazard communication training for employees. OSHA notified MPW on July 6, 1999 of its inspection findings.

Plaintiff claims that he suffered injuries during the course of his employment at MPW's Newark facility. Specifically, Perrine claims that his daily exposure to hazardous conditions caused throat, lung, and hand conditions in 1999. He now suffers from seriously decreased lung capacity, which prevents him from engaging in the types of physical activities that he enjoyed previously. According to Dr. Simon, Perrine's breathing problems, including asthma, were substantially exacerbated by his exposure to the fumes and vapors in the

---

**1.** MPW claims that Perrine's assertions regarding his work environment are an exaggeration of the truth.

**2.** The parties agree that OSHA later determined that the fumes were found to be within acceptable limits.

Newark facility. Perrine also suffers from severe dermatitis on his hands that often prevents him from performing simple tasks of dexterity. Dr. Simon believes that this skin condition is due to the chemical exposure that Perrine endured in Newark. As a result of these injuries, Plaintiff has had to seek extensive medical attention and take a variety of prescription medications to alleviate his symptoms.

MPW terminated Perrine's employment on July 16, 1999.

## II. PROCEDURAL HISTORY

Plaintiff and his wife, Debra Perrine, filed their Complaint against Defendant on June 7, 2000, demanding compensatory and punitive damages based upon seven causes of action: (1) employer intentional tort; (2) disability discrimination and retaliation; (3) violation of the Family and Medical Leave Act; (4) promissory/equitable estoppel; (5) public policy violation; (6) intentional infliction of emotional distress; and (7) loss of consortium. Defendant filed its answer on July 17, 2000. On December 18, 2001, Defendant filed a motion for summary judgment on all seven causes of action. Plaintiffs have abandoned their claims of disability discrimination, violation of the Family and Medical Leave Act, and promissory/equitable estoppel. The remaining issues for this Court's consideration include five causes of action for intentional tort, retaliation, violation of public policy, intentional infliction of emotional distress, and loss of consortium.

## III. STANDARD OF REVIEW

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R.CIV.P. 56(c). The movant has the burden of establishing that there are no genu-

ine issues of material fact, which may be accomplished by demonstrating that the non-moving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.,* 12 F.3d 1382, 1388–89 (6th Cir.1993). In response, the non-moving party must present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.,* 8 F.3d 335, 339–40 (6th Cir.1993). In applying Rule 56(c), the court should evaluate the motion on its own merits and view the evidence in the light that is most favorable to the non-moving party and then determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wiley v. United States,* 20 F.3d 222, 224 (6th Cir.1994). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson,* at 248, 106 S.Ct. 2505; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the nonmoving party).

## IV. ANALYSIS

### A. Plaintiff's Intentional Tort Claim

In most circumstances, an employee injured in the course of employment is limited to redress through the Ohio Workers' Compensation Act, Ohio Revised Code § 4123.90. The Workers' Compensation Act, although generally comprehensive, contains certain limited exceptions. One such exception exists for injuries resulting

from an employer's intentional tort upon an employee.

■ To prove intentional tort under Ohio law, a plaintiff must establish: "(1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task." *Fyffe v. Jeno's, Inc.*, 59 Ohio St.3d 115, 570 N.E.2d 1108 (1991) (paragraph one of the syllabus). The Ohio Supreme Court in *Fyffe* elucidated the intentional tort standard:

> [P]roof beyond that required to prove negligence and beyond that to prove recklessness must be established. Where the employer acts despite his knowledge of some risk, his conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of a risk—something short of substantial certainty—is not intent.

*Id.* (paragraph two of the syllabus).

Plaintiff maintains that MPW committed an intentional tort by requiring him to work in openly dangerous conditions.

Plaintiff contends that these conditions existed during the entire period of his employment and were "readily apparent to the naked eye." Perrine claims that not only did MPW have knowledge of the situation through circumstantial evidence, but that it also knew of the situation directly as a result of employee complaints made to Gomez and Swoop. Additionally, Perrine asserts that MPW betrayed its knowledge of the situation by expressing concerns over a possible OSHA inspection. Specifically, Perrine states that Swoop told him that he was "... worried about OSHA coming through and a few things like that."

Plaintiff claims that MPW knew with substantial certainty that he would suffer harm because the Company failed to provide adequate training and protective equipment for employees working around chemicals known to be dangerous. Perrine points out that while MPW disputes his assertions regarding the work environment at the Newark facility, OSHA confirmed the fact that MPW's training and equipment were both lacking. According to Plaintiff, MPW knew that OSHA had established exposure limits regarding dangerous chemicals to protect employees, yet the Company still exposed its employees to these substances without proper training. Finally, Perrine asserts that MPW clearly knew about the hazardous conditions at the Newark facility, yet required Perrine to continue working.

Defendant suggests that Perrine's testimony should be viewed with skepticism. MPW claims that on two separate occasions, Perrine testified that he never had a throat or lung condition prior to 1999, when, in fact, he developed his throat and lung conditions while he was in an Ohio correctional facility between February 1990 and November 1994.[3] Thus, the

---

**3.** During the course of discovery, MPW obtained a copy of Perrine's medical records

Company argues that Perrine's assertion that the work environment at the Newark facility caused his ailments is dubious at best. Furthermore, MPW claims that Perrine's medical expert based his conclusions regarding a link between Perrine's lung condition and his employment at MPW on the absence of any history of throat and lung problems.

Defendant argues that Perrine cannot satisfy the first prong of the *Fyffe* standard and demonstrate that MPW had knowledge of dangerous conditions for two reasons. First, Perrine's own statements are the only evidence that such conditions existed at the time of his employment. Second, if the conditions at the Newark facility were neither openly dangerous nor ever reported, then MPW could not have known of their existence. When balanced against facts that indicate no obvious danger, such as the results of OSHA's air sample tests [4], Perrine's description of his work environment falls short of establishing a triable issue of fact. MPW also highlights the fact that Plaintiff never attributed his medical condition to his employment until after he stopped working at the Newark facility.

Moreover, Defendant claims that no other employee has ever complained of a hand, throat, or lung condition suffered as a result of alleged chemical exposure while working at MPW. The Company contends that, while the absence of prior injuries is not necessarily fatal to a plaintiff's claim, a lack of prior injuries suggests that the employer did not have the requisite knowledge. Thus, Defendant argues that if no one alerted MPW to the problems, and they were not obvious, the Company could not have known of a dangerous condition.

Defendant contends that Plaintiff cannot satisfy the second element of the *Fyffe* standard—that MPW knew with substantial certainty that Perrine would suffer harm—for two reasons. First, the Company had no knowledge of a dangerous working condition. Second, MPW claims that it provides its employees with safety training and protective equipment. Defendant believes that Plaintiff's contention that both the equipment and training were insufficient for the work conditions is misplaced, because Perrine assumes that the Company knew that the training and equipment were insufficient. To the contrary, MPW claims that it demonstrated a desire to protect its employees from harm by providing training and safety equipment. Moreover, the amount of training and equipment that the Company provided is indicative of the amount of danger that it felt its employees faced. MPW felt the risk of employee exposure to minimal levels of chemicals was mitigated by the equipment and training it provided. Finally, Defendant argues that Plaintiff cannot satisfy the third element of the *Fyffe* standard because Perrine has presented no evidence that MPW required him to continue working in dangerous conditions.

### 1. First Element of an Intentional Tort: Whether MPW Knew of the Existence of Dangerous Conditions

■ The Court finds that a question of fact exists with regard to this first element of the *Fyffe* standard because a reasonable jury could find that MPW was aware of a hazardous work environment. To fully resolve this issue, the Court must make two inquires. Was the environment at the Newark facility, in fact, hazardous? And,

from Orient Correctional Institution. Defendant asserts that during his incarceration, Perrine was diagnosed and treated extensively for chronic obstructive pulmonary disease.

4. MPW points out that the July 1999 OSHA air sample study showed that the amounts of dangerous chemicals in the air at the regeneration facility were within acceptable levels.

if so, was Defendant aware of such hazardous conditions?

First, both parties point to the OSHA inspection results as conclusively supporting their arguments, and each ignores portions of those results that do not advance their positions. MPW, for instance, ignores the fact that OSHA found that its employees were exposed to hydrochloric acid as a result of leaking equipment. In the same manner, Perrine ignores OSHA's finding that the Newark facility's air quality was within proscribed safety limits. While the test was taken after Perrine stopped working there, it was conducted only twenty days after his employment ended. Although Perrine claims that the conditions in the facility were "blatant, obvious and long-term," his inability to gather additional testimony from his co-workers to support his assertions is troublesome. Still, the OSHA report alone clearly raises an issue of material fact as to whether the conditions in the Newark facility were hazardous.

Assuming that the conditions at the Newark facility were, in fact, as openly dangerous as Perrine describes, then MPW would be hard pressed to deny direct knowledge of the situation. The conditions, however, could have been dangerous but not obvious. A jury, working to ascertain the truth of Perrine's statements with regard to his co-workers, must determine whether MPW was aware of a hazardous work environment. Whether employees confronted the Company about the working conditions is another issue of fact not suitable for resolution on summary judgment. Furthermore, a reasonable jury could find that the presence of certain chemicals, by definition, creates a hazardous work environment of which MPW should have been aware. Finally, the fact that no other employee has been injured in Plaintiff's work area is of little consequence, for if this Court "were to accept [Defendant's] reasoning, it would be tantamount to giving every employer one free injury for every decision, procedure or device it decided to use, regardless of the knowledge or substantial certainty of the danger that the employer's decision entailed." *Cook v. Cleveland Elec. Illum. Co.*, 102 Ohio App.3d 417, 657 N.E.2d 356, 364 (1995).

Consequently, MPW has failed to demonstrate the absence of any genuine issue of material fact with regard to the first element of the *Fyffe* standard.

### 2. Second Element of an Intentional Tort: Whether MPW Knew that Harm was Substantially Certain to Occur

■ This case contains genuine issues of material fact with regard to the second element of an intentional tort. As the Sixth Circuit has stated, "[i]t is not enough that the harm was likely to occur. Nor is it enough that there was a high risk of it occurring. Rather, it must have been substantially certain to occur.... This second prong of the *Fyffe* test holds that the mere knowledge and appreciation of a risk—something short of substantial certainty—is not intent." *Jandro v. Ohio Edison Co.*, 167 F.3d 309, 314–15 (6th Cir.1999) (citations omitted). This is a high threshold that Plaintiff must satisfy.

One of the key questions in this context is whether Defendant provided adequate training and safety equipment for Perrine. In light of the OSHA findings, Perrine claims that *Richards v. C. Schmidt Co.*, 54 Ohio App.3d 123, 561 N.E.2d 569 (1989), is dispositive with regard to this issue. In *Richards*, an employee of a company that manufactured foam-insulated refrigerator boxes sued his employer and chemical suppliers for exposure to hazardous materials. The court held that: (1) the employee failed to show that inadequate warnings were provided by the supplier of chemicals

used in a foam machine; (2) the employee failed to show that inadequate warnings were provided by the supplier of chemicals used to rinse the machine; and (3) there existed an issue of material fact, which precluded summary judgment for the employer, as to whether the employer knew that instructing its employees to work without proper ventilation and without safety equipment, and encouraging skin contact with chemicals, would, with substantial certainty, cause injuries from which the employee suffered, and thus whether the employer committed an intentional tort against employee.

Citing *Richards,* Plaintiff contends that an employer's failure to provide adequate training and safety equipment creates an issue of material fact as to whether the employer was substantially certain that harm would occur to its employees. A close reading of *Richards,* though, reveals distinguishable facts. In addition to not providing adequate safety equipment and training, the employer in *Richards* also encouraged direct contact with chemicals, and assured the employee that he would not be harmed by such contact. *Id.,* 561 N.E.2d at 572. While the facts in *Richards* are not identical to those in this case, it nonetheless supports Perrine's contention that lack of training and protective equipment may raise a genuine issue of material fact with regard to the second element of the *Fyffe* standard.

As it is almost inevitable—or substantially certain—that an employee who works around dangerous chemicals without adequate training and protective equipment will, in time, suffer an injury, a reasonable jury could find that MPW was aware of this fact and adopted a "stance of ignorance" or "willful blindness." *Jandro,* 167 F.3d at 316. Thus, unless MPW can prove that there is no genuine issue of material fact with regard to the adequacy of its training program and availability of

protective equipment, Defendant is not entitled to judgment as a matter of law on this element. In this case, a factual dispute exists as to whether the equipment and training provided by MPW was adequate to protect the Newark facility employees. Perrine claims that neither the equipment nor the training was sufficient to protect him from harm. For example, he received cursory training at another facility and was only provided with a respirator at the end of his tenure. He claims that he had to buy his own gloves after the Company refused to provide them. Furthermore, Perrine cites OSHA's findings that not only was protective equipment lacking, but that some of MPW's training was substandard. The fact that Defendant denies such charges is of no consequence.

Thus, with regard to the second element, MPW has failed to demonstrate the absence of any genuine issues of material fact.

### 3. Third Element of an Intentional Tort: Whether MPW Required Perrine to Work in Dangerous Conditions

█ The Court finds that a genuine issue of material fact also exists with regard to the third element of an intentional tort. Defendant claims that Plaintiff did not tell management about his belief that his medical conditions were related to his working environment until after he took medical leave on May 13, 1999. Plaintiff, however, claims that he voiced concern to Gomez and Swoop about the lack of ventilation, spills of toxic chemicals, and the smoke and vapors from those substances at an earlier date. Perrine alleges that he requested gloves because of his splitting and bleeding hands, but was denied. Furthermore, Perrine contends that the open and obvious nature of the danger belies Defendant's willingness to have him work in such conditions. As MPW knew of the danger and did nothing to protect Perrine

from harm, the Company essentially required him to work in hazardous conditions. A jury could surmise that, by requiring Perrine to continue to work in the Newark facility, Defendant took a stance of "active ignorance" or "willful blindness" in the face of these obvious hazards. *Id.* Furthermore, as the Ohio Supreme Court recently held:

> [F]or purposes of surviving a motion for directed verdict, it is not necessary for an employee to show that the employer expressly ordered the employee to engage in the dangerous task. Instead, the third element of the *Fyffe* test can be satisfied by presenting evidence that raises an inference that the employer, through its actions and policies, required the employee to engage in that dangerous task.

*Gibson v. Drainage Products, Inc.*, 95 Ohio St.3d 171, 766 N.E.2d 982, 989 (2002). While the issue in *Gibson* concerned the evidence necessary to survive a motion for a directed verdict in relation to the third element of *Fyffe*, the rationale applied in *Gibson* is equally applicable at the summary judgment stage.[5]

Thus, because issues of material fact exist with regard to each element of the *Fyffe* standard, the Court **DENIES** Defendant's motion for summary judgment as to Plaintiff's intentional tort claim.

## B. Plaintiff's Claim for Retaliatory Discharge

Ohio Revised Code § 4112 is the state law equivalent of Title VII of the Civil Rights Act of 1964. *Williams v. United Dairy Farmers*, 20 F.Supp.2d 1193, 1197

(S.D.Ohio 1998). The Ohio courts have held that the evidentiary standards and burdens of proof applicable to a claimed violation of Title VII are likewise applicable in determining whether a violation of O.R.C. § 4112 has occurred. *Williams v. Ford Motor Co.* 187 F.3d 533, 538 (6th Cir.1999) (citations omitted). Thus, the federal case law governing Title VII actions is generally applicable to cases involving alleged violations of § 4112. *Id.*

▆▆▆ To establish a *prima facie* case of retaliation under Title VII or O.R.C. § 4112, a plaintiff must establish that: (1) he was engaged in protected activity; (2) the defendant knew of this exercise of his protected rights; (3) the defendant consequently took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse job action. *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 831 (6th Cir.1999). If and when plaintiff has established a *prima facie* case, the burden of production of evidence shifts to the employer to articulate some legitimate, nondiscriminatory reason for its actions. *Canitia v. Yellow Freight System, Inc.*, 903 F.2d 1064, 1066 (6th Cir.1990). The plaintiff, who bears the burden of persuasion throughout the entire process, then must demonstrate that the proffered reason was not the true reason for the employment decision. *Id.*

▆▆▆ Plaintiff argues that he satisfies the first element of the *prima facie* case because he engaged in protected activity by filing an OSHA complaint and by making a workers' compensation claim.[6] Perrine

---

**5.** Indeed, in reaching its decision, the *Gibson* Court relied on *Hannah v. Dayton Power & Light Co.*, 82 Ohio St.3d 482, 696 N.E.2d 1044 (1998), which examined the evidence necessary to survive summary judgment in relation to the third element of *Fyffe*.

**6.** Ohio Revised Code § 4123.90 provides in part: "No employer shall discharge, demote,

reassign, or take any punitive action against any employee because the employee filed a claim or instituted, pursued or testified in any proceedings under the workers' compensation act for an injury or occupational disease which occurred in the course of and arising out of his employment with that employer."

claims that MPW could have easily learned about both the OSHA complaint and the workers' compensation claim from several sources, including his doctor, between the time he engaged in protected activity and the day he was fired. Perrine points out that the third element of the *prima facie* case is satisfied because MPW terminated his employment. Finally, Perrine argues that because he was fired only ten days after MPW received the results of the OSHA inspection, a causal connection exists between his termination and MPW's receipt of the negative results. Plaintiff contends that Defendant's stated justification for his termination—absenteeism—is pretextual because he and MPW were in the process of working through the issues surrounding his absences. Because both parties had been moving toward a reasonable solution for over two months, absenteeism could not have been the reason for his sudden termination.

Defendant argues that Plaintiff cannot establish a *prima facie* case of retaliation because MPW was unaware that Perrine had engaged in protected activity. Defendant contends that Plaintiff's workers' compensation retaliation claim also fails because Perrine did not comply with the statutory requirements of O.R.C. § 4123.90.[7] Defendant claims that Plaintiff's absenteeism was a legitimate, nondiscriminatory reason for his discharge. The Company alleges that Perrine was continually absent from work, provided inadequate reasons for his absenteeism, and failed to comply with MPW's directives on the issue. Finally, MPW asserts that this reason was not pretextual, because the Company discussed the problem with Perrine prior to his termination, and because

Perrine cannot demonstrate that MPW knew of his protected activity.

The Court finds that genuine issues of material fact exist with regard to Plaintiff's retaliation claim. First, it is unclear whether Defendant knew that Perrine had filed an OSHA complaint and workers' compensation claim. If Defendant is correct in that Perrine was the only employee to have ever been injured on the job, the Company could have reasonably assumed that he was responsible for contacting OSHA. Moreover, Plaintiff contends that he told Gomez of his intention to file a workers' compensation claim. Perrine also claims that he presented workers' compensation papers to his doctor's office on May 13, 1999 and that, because Swoop talked with his doctor, it is reasonable to assume that MPW learned of the impending claim.

Perrine was fired only ten days after MPW learned of the results of the OSHA inspection. When viewed in the light most favorable to him, it is certainly possible that Perrine was terminated for reasons other than absenteeism. MPW took little action with regard to Perrine's employment for over two months after he stopped showing up for work. A reasonable jury could find that, after demonstrating an initial interest in Perrine's absence in May 1999, MPW took no action with regard to Perrine until OSHA released its inspection results, two months later. Very few employers would allow an employee to miss work without complying with company directives for over two months without taking some punitive action. Either MPW's management allowed Perrine to slip through the cracks, or Perrine was, in fact, complying with the Company's directives.

---

7. Ohio Revised Code § 4123.90 provides that the claim is forever barred unless it is filed within 180 days of the discharge and written notice is provided to the employer within 90 days of the discharge. Perrine allegedly never provided written notice to MPW of the alleged violation, and his lawsuit was not filed until almost a year after his termination.

Either way, the situation creates an argument of convenience for MPW. It is too coincidental that after ignoring his absenteeism for so long, MPW fired Perrine within ten days of receiving negative results from an OSHA inspection initiated by Perrine. The collective wisdom of a jury should resolve a "coincidence" of this nature.

These disputed issues of fact certainly raise the possibility that Plaintiff could set forth a *prima facie* case of retaliation, and establish that Defendant's stated reason for his termination was pretextual. Therefore, the Court **DENIES** Defendant's motion for summary judgment with regard to Plaintiff's retaliatory discharge claim.

### C. Plaintiff's Claim of a Violation of Public Policy

■ To state a claim of wrongful discharge in violation of public policy, "a plaintiff must allege facts demonstrating that the employer's act of discharging him contravened a 'clear public policy.'" *Painter v. Graley*, 70 Ohio St.3d 377, 639 N.E.2d 51, 56 (1994). The "clear public policy" can be based on statutes, the Constitutions of Ohio and the United States, administrative rules and regulations, and the common law. *Id.* In *Kulch v. Structural Fibers, Inc.*, 78 Ohio St.3d 134, 677 N.E.2d 308 (1997), the Ohio Supreme Court set out the elements necessary to succeed on a claim for wrongful discharge in violation of public policy under Ohio law:

(1) that [a] clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element); (2) that dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element); (3) the plaintiff's dismissal was motivated by conduct related to the public policy (the causation element); and (4) the employer lacked overriding legitimate business justification for the dismissal (the overriding justification element).

*Id.*, 677 N.E.2d at 321. The first two factors of the *Kulch* test are questions of law for the Court to decide, although the third and fourth elements are for the trier of fact, and are not appropriate for summary judgment. *Id.*

■ Plaintiff claims that by filing an OSHA complaint and a workers' compensation claim, the first two elements are met as a matter of law under *Kulch* and *Boyd v. Winton Hills Med. & Health Ctr., Inc.*, 133 Ohio App.3d 150, 727 N.E.2d 137, 144 (1999), respectively. Perrine argues that, because the second two elements are issues of fact and he has presented probative evidence pointing not only to a causal connection between his protected activity and his discharge, but also that the absenteeism justification was pretextual, summary judgment should be denied.

Defendant claims that Perrine's common law claim is barred because it falls within the scope of statutory law that provides an adequate remedy. MPW also argues that Perrine cannot establish the third and fourth elements of a violation of public policy claim.

The Court finds that Plaintiff has raised genuine issues of material fact that preclude summary judgment on his wrongful discharge in violation of public policy claim. In *Wallace v. Trumbull Mem. Hosp.*, 970 F.Supp. 618 (N.D.Ohio 1997), the court cited *Kulch* for the proposition that "the mere existence of statutory remedies does not without more, operate to bar a claim for wrongful discharge unless the remedies available under the statute are sufficient to provide the complete relief that would otherwise be available in a common law cause of action for wrongful discharge." *Id.* at 621.

■ In the matter *sub judice*, Perrine's public policy claim is premised on both statutory and common law. As Plaintiff correctly argues, an employer's violation of Ohio's workers' compensation statute, which bars retaliation against employees who file claims, could support a common law claim based upon the public policy underlying O.R.C. § 4123.90. The court in *Boyd* stated:

> We believe that *Kulch's* rationale is broad enough to encompass workers' compensation retaliation claims. Just as there is a clear public policy against retaliation for filing whistleblower claims, there is also a clear public policy against retaliation for filing workers' compensation claims. As in *Kulch*, where the plurality concluded that the legislature did not intend remedies under the whistleblower statute to be exclusive, we conclude that a plaintiff in a workers' compensation retaliation case is entitled to more relief than that provided under R.C. 4123.90. R.C. 4123.90's relief in termination cases is limited to reinstatement with back pay and attorney fees, but there is no evidence that the legislature intended relief under R.C. 4123.90 to be exclusive.

*Boyd*, 727 N.E.2d at 144. Moreover, an alternative public policy in Plaintiff's claim arises from his OSHA complaint. The Ohio Supreme Court has recognized that there are public policy issues raised when an employee is terminated after filing an OSHA complaint. *See Kulch*, 677 N.E.2d at 322. The plaintiff in *Kulch* was fired after notifying OSHA of possible toxic chemicals in his workplace, and the Court held that both the clarity and jeopardy elements of a violation of public policy claim were satisfied by the employee's reporting safety concerns to OSHA. Federal and Ohio law support workplace safety and those public policies would be undermined if employees could be fired for reporting possible dangers.

Thus, the Court **DENIES** Defendant's motion with regard to Plaintiff's wrongful discharge in violation of public policy claim.

### D. Plaintiff's Claim for Intentional Infliction of Emotional Distress

■ Under Ohio law, " '[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.' " *Yeager v. Local Union 20*, 6 Ohio St.3d 369, 453 N.E.2d 666, 671 (1983) (citation omitted).

■ Plaintiff argues that Defendant's behavior was extreme and outrageous in that it knowingly required Perrine to continue working in a patently hazardous environment. As a result of his exposure to the hazardous conditions, without adequate training or protective gear, Perrine suffered injuries that have caused him to endure repeated visits to physicians and to take prescription drugs on a daily basis. This additional stress, as well as coping with a broken body and a curtailed sex life, has caused Perrine serious emotional anguish.

Defendant argues that it had no knowledge of the allegedly hazardous working conditions and that, because he was terminated for absenteeism, he cannot claim that the Company acted in an extreme and outrageous manner. Furthermore, even if Perrine is able to overcome the high standard for extreme and outrageous behavior, he has provided no evidence to show that he suffered serious emotional distress.

The Court finds that Plaintiff has not raised any issue of material fact with respect to his intentional infliction of emotional distress claim. "Extreme and outrageous conduct" has been defined as follows:

It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'

*Id.*, 453 N.E.2d at 671 (citations omitted). Even if Defendant is liable for an intentional tort, Plaintiff has adduced no evidence to demonstrate that MPW's actions rose to this level of culpability.

 Furthermore, Perrine has presented no evidence indicating that he has suffered from extreme emotional distress. The Ohio Supreme Court has defined serious emotional distress:

By the term serious, we of course go beyond trifling mental disturbance, mere upset or hurt feelings. We believe that serious emotional distress describes emotional injury that is both severe and debilitating ... A non-exhaustive litany of some examples of serious emotional distress should include traumatically induced neurosis, psychosis, chronic depression, or phobia.

*Paugh v. Hanks*, 6 Ohio St.3d 72, 451 N.E.2d 759, 765 (1983). Courts applying Ohio law have sought some evidence showing hospitalization or medical treatment with regard to a legitimate condition. *See, e.g., Katterhenrich v. Fed. Hocking Local Sch. Dist. Bd. Of Educ.*, 121 Ohio App.3d 579, 700 N.E.2d 626, 633–34 (1997). In *Katterhenrich*, the court found that the plaintiff's lack of treatment with a psychiatrist or a psychologist demonstrated that he did not suffer from emotional injury that was both severe and debilitating. Other than an affirmative statement indicating that he has suffered emotional distress, Perrine has not established that he was ever treated for any mental ailment. Nor has he set forth any reason why his inability to have sexual intercourse should be considered as severe and debilitating as traumatically induced neurosis or psychosis. Finally, Perrine has not indicated that he is unable to be both a husband and companion to his wife. While it is possible that they cannot enjoy some activities together, an alleged limitation on some daily actives is not sufficient to create severe and debilitating emotional distress.

Therefore, the Court **GRANTS** Defendant's motion with respect to Plaintiff's intentional infliction of emotional distress claim.

### E. Plaintiffs' Claim of Loss of Consortium

 In Ohio it is well established that a wife has a cause of action for damages for loss of consortium against a person who, either intentionally or negligently, injures her husband and thereby deprives her of the love, care and companionship of her husband. *Clouston v. Remlinger Oldsmobile Cadillac, Inc.*, 22 Ohio St.2d 65, 258 N.E.2d 230, 235 (1970). This cause of action is defined as the loss of "certain tangible and intangible benefits which arise out of the marital relationship itself." *Hughes v. Schulty*, 43 Ohio App.3d 139, 539 N.E.2d 1158, 1159 (1988). Consortium consists of "society, services, sexual relations and conjugal affection, which includes companionship, comfort, love and solace." *Id.* (internal quotation omitted).

 Plaintiff claims that he was injured by the intentional acts of MPW, and, consequently, can no longer partake in actives that he and his wife used to enjoy together. Most importantly, the Perrines' sex life has been significantly and adversely affected. Mrs. Perrine contends that she has been deprived of love and companionship as a result of MPW's actions and is entitled to recover accordingly.

Defendant maintains that because it is not liable for either intentional tort or intentional infliction of emotional distress, Mrs. Perrine has no cause of action. Additionally, other than Plaintiffs' statements, Defendant points out that no evidence has been provided to support their assertions regarding the loss of love and companionship.

 The Court finds that Mrs. Perrine's claim for loss of consortium must stand. Contrary to Defendant's assertion, "a wife's loss of consortium claim is not necessarily defeated by a valid defense to her husband's claim against the tortfeasor." *Bowen v. Kil–Kare, Inc.,* 63 Ohio St.3d 84, 585 N.E.2d 384, 391 (1992) (citation omitted). Indeed, "the right of a wife to the consortium of her husband is a personal right" and "is her separate property which grows out of an injury to her personal rights and [ ] she may pursue the claim in her own name." *Id.* The couple claims that, as a result of Perrine's injury, they can no longer enjoy many of the activities that they shared previously. The credibility of such claims is for the trier of fact to decide, not the Court on summary judgment.

The Court, therefore, **DENIES** Defendant's motion as to Plaintiffs' loss of consortium claim.

### V. CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant's motion for summary judgment with respect to Plaintiffs' claims of intentional tort; retaliatory discharge; wrongful discharge in violation of public policy; and loss of consortium; and **GRANTS** Defendant's motion as to all other claims in this matter.

**IT IS SO ORDERED.**