{¶ 64} While I agree with the majority's decision regarding the meeting held on March 8, 2002, I respectfully dissent from its decision regarding the meetings on February 27, 2002, and April 5, 2002.
 {¶ 65} The Board gave the news media less than twenty-four hours notice of the February 27th meeting. The only time this is acceptable is if the meeting is held in an emergency situation. The reason the meeting was necessary was because the Board failed to address an important issue at previous meetings. Since the meeting was necessitated by the Board's own neglect rather than circumstances beyond its control, the trial court properly concluded that the situation was not an emergency. Because the Board violated the Sunshine Law by not giving proper notice of this meeting to the news media, the trial court properly awarded Wolf a civil forfeiture from the Board. Accordingly, I would affirm the trial court's decision granting Wolf summary judgment regarding the February 27, 2002 meeting and the civil forfeiture and award.
 {¶ 66} The record contains conflicting evidence regarding whether the Board properly entered executive session at the April 5th meeting. Since the record contains conflicting evidence, there is a genuine issue of material fact and the issue cannot be decided on summary judgment. Accordingly, I would reverse the trial court's decision to grant summary judgment to Wolf regarding this date and would remand this matter for further proceedings regarding the April 5th meeting.
 Sunshine Law {¶ 67} The purpose of Ohio's Sunshine Law is "to enable any member of the general public to seek enforcement of the statute when public officials circumvent the public's right to observe public officials as they conduct official business." State exrel. Mason v. State Emp. Relations Bd. (1999),133 Ohio App.3d 213, 218. Both parties concede that the school board is a public body subject to this statute pursuant to R.C.121.22(B)(1). R.C. 121.22(F) provides the manner in which a public body must notify the public of a special meeting.
 {¶ 68} "A public body shall not hold a special meeting unless it gives at least twenty-four hours' advance notice to the news media that have requested notification, except in the event of an emergency requiring immediate official action. In the event of an emergency, the member or members calling the meeting shall notify the news media that have requested notification immediately of the time, place, and purpose of the meeting." Id.
 {¶ 69} The term "special meeting" is not defined in R.C.121.22, but it means any meeting other than a regularly scheduled meeting. Katterhenrich v. Fed. Hocking Local School Dist. Bd. ofEdn. (1997), 121 Ohio App.3d 579, 587. If a public body does not comply with R.C. 121.22(F), then any action it takes at the special meeting in question is invalid. R.C. 121.22(H).
 {¶ 70} In this case, the facts leading up to the February 27th meeting regarding the notice given to the media are undisputed. Aronoff, the school board president, testified that on February 9, 2002, she learned the school board would have to vote to non-renew the superintendent's contract before March 1, 2002, in order to accept his retirement/resignation. The school board held regular meetings on February 11 and February 25, 2002. The school board did not address whether to non-renew the superintendent's contract at either the February 11th or 25th meetings. Aronoff did not attend the February 25th meeting and learned on February 26th that the board did not vote on whether to non-renew the superintendent's contract at the previous day's meeting. After Aronoff found this out, she called an emergency special meeting for the next day to vote on that matter since that was the only day she could assemble a quorum of the school board before March 1st. She gave the media less than twenty-four hours notice of that special meeting.
 {¶ 71} Since the facts are undisputed, the resolution of whether the school board gave the statutorily required notice of the February 27th meeting to the news media depends upon what R.C. 121.22(F) means by "emergency". Defining words in a statute is a matter of statutory construction, subject to de novo review as a matter of law. Kemo v. St. Clairsville (1998),128 Ohio App.3d 178, 183. Accordingly, it is a particularly appropriate matter for summary judgment.
 {¶ 72} As the majority states, when a court is interpreting a statute, it must read "`undefined words and phrases in context and construe them in accordance with the rules of grammar and common usage.'" Id. at ¶ 40, quoting State ex rel. Portage LakesEdn. Assn., OEA/NEA v. State Emp. Relations Bd.,95 Ohio St.3d 533, 2002-Ohio-2839, ¶ 36. Since the word "emergency" is undefined, we must look to the common usage of the term. And it is defined as "an unforeseen combination of circumstances or the resulting state that calls for immediate attention." Merriam-Webster's Collegiate Dictionary (10th Ed. 1998), 377. Although this definition of "emergency" is different than that adopted by the majority, they are practically the same. See Opinion at ¶ 40.
 {¶ 73} The facts in this case clearly and unambiguously demonstrate that there was no emergency on February 27, 2002, as the word is commonly used. Accordingly, that meeting was not an emergency meeting. The fact that the Board had failed to non-renew the superintendent's contract was neither an "unforeseen combination of circumstances or the resulting state that calls for immediate attention" nor "an unexpected situation or sudden occurrence of a serious and urgent nature that demands immediate attention." Aronoff knew that the March 1st deadline was approaching. The need to address the superintendent's contract before that deadline was neither unforeseen, unexpected, nor sudden. Instead, the situation arose from the school board's failure to non-renew the superintendent at previous meetings, a matter which is in the sole control of the school board itself.
 {¶ 74} The majority refuses to follow the Eleventh District's decision in Neuvirth v. Bainbridge Twp. Bd. of Trustees (June 29, 1981), 11th Dist. No. 919, where it held that a public body "could not postpone considering the matter until the last minute and then claim an emergency", arguing that the Eleventh District "gives no factual or analytical context for its conclusion." Opinion at ¶ 44. But the reason for its conclusion is obvious. A situation is not an emergency if it is not an "unexpected situation" or an "unforeseen combination of circumstances." When a public body must address a situation by a certain date and fails to do so, then the situation is completely expected and foreseeable.
 {¶ 75} The record does not indicate that the Board intentionally tried to circumvent the public's right to observe its decision over whether to non-renew the superintendent. But as a practical matter, the manner in which it handled the situation did just that. The Board first learned of the superintendent's intent to retire/resign in the fall of 2001. On February 9, 2002, the Board's president learned that the Board had to non-renew the superintendent's contract in order to accept his retirement. The Board held numerous meetings after finding out about the superintendent's decision to retire/resign and held two regular meetings after its president found out about the Board's obligation to specifically non-renew the superintendent's contract. But the Board failed to address the issue at any of those meetings. Instead, through its own neglect, it failed to consider the matter until it was almost too late.
 {¶ 76} The majority laments the fact that this interpretation of the statute will make it "practically impossible to declare an emergency meeting that would be valid under R.C. 121.22(F)" and worries that adopting this interpretation would "outlaw procrastination in all public offices and organizations. Opinion at ¶ 46. First of all, this is a false statement. It is easy to contemplate situations which may call for emergency action by a public body like a school board. For instance, if a school superintendent is arrested for drug trafficking and accused of selling those drugs to students, then a school board may want to take emergency measures to relieve him of his duties. Likewise, if a teacher or athletic coach was arrested and accused of improper sexual relations with a student, then a school board may want to take emergency measures. Anyone who watches the news or reads the newspaper has heard of incidents like these.
 {¶ 77} Thankfully, these kinds of emergency situations are rare. But so is any situation which needs action so immediately that the public body cannot give twenty-four hours notice of its meeting. Nevertheless, history has shown that the possibility does exist. The fact that the General Assembly wisely recognized the possibility that a situation could be an emergency does not mean that we must sanction a public body's liberal interpretation of whether or not a situation is an emergency.
 {¶ 78} Furthermore, our recognition that this is not an emergency does not prevent, or even criticize, procrastination. If a public body does not wish to address a situation at the earliest possible moment, then it need not do so. There is nothing in R.C. 121.22 which requires a public body to address any and all issues at the soonest possible moment or at the first possible meeting. A public body may decide to delay taking a particular action for any reason or no reason at all. If a public body chooses not to take an action at a regularly scheduled meeting, it may take that action at a special meeting. The only thing that the statute requires is that the public body gives twenty-four hours notice before that meeting.
 {¶ 79} If we sanction these actions by granting summary judgment to the school board, then we circumvent and ignore the purpose of the Sunshine Law. We cannot "enable any member of the general public to seek enforcement" of the public's right to observe public officials as they conduct official business if we allow public officials to circumvent that right by waiting until the last minute to conduct that business when the public officials had numerous opportunities to conduct official business sooner. It does not matter whether or not the Board intentionally circumvented the public's right to know. The fact remains that it is the Board's own failure to deal with an issue in a timely manner that created the alleged "emergency". Because the Board did not deal with this issue at the proper time, the public was denied the opportunity to observe the school board as it conducted its official business. I cannot ignore the purposes of the Sunshine Law merely because I believe that the Board accidentally violated that law.
 {¶ 80} The reason the majority fails to make this obvious conclusion is because it is concerned that this conclusion will "violate the doctrine of the separation of powers." Opinion at ¶ 45. But what the majority fails to understand is that its decision violates that doctrine by granting the judicial power to interpret statutes to the other branches of government.
 {¶ 81} "The United States Constitution does not impose the doctrine of separation of powers on the states." Mayor ofPhiladelphia v. Educational Equality League (1974),415 U.S. 605, 615. But "the doctrine of separation of powers is `implicitly embedded in the entire framework of those sections of the Ohio Constitution that define the substance and scope of powers granted to the three branches of state government.'"State ex rel. Bray v. Russell (2000), 89 Ohio St.3d 132, 134, quoting S. Euclid v. Jemison (1986), 28 Ohio St.3d 157,158-159. This doctrine arises from "the general principle that a grant of general powers to any department constitutes of itself an implied exclusion of all other departments from the exercise of such powers." Fairview v. Giffee (1905), 73 Ohio St. 183,188. It "recognizes that the executive, legislative, and judicial branches of our government have their own unique powers and duties that are separate and apart from the others." State v.Thompson (2001), 92 Ohio St.3d 584, 586. Its purpose is "to create a system of checks and balances so that each branch maintains its integrity and independence." Id.
 {¶ 82} The majority believes that both we and the trial court are overstepping our bounds if we "dictate to an executive branch agency that the agency cannot declare an emergency meeting if it was at all possible to accomplish the work of that emergency session at an earlier time." Opinion at ¶ 46. It believes that "[a] school board, a city council, or a county board of commissioners must be the entity primarily responsible for determining its own emergencies. * * * [W]e would be overstepping our judicial authority if we essentially eliminated the right of a school board, or any other public body, to rely on its own discretion in determining what is and what is not an emergency." Id.
 {¶ 83} This belief is flawed because it confuses the various roles of the different branches of government. "`That which distinguishes a judicial from a legislative act is that the one is a determination of what the existing law is, in relation to some existing thing already done or happened, while the other is a predetermination of what the law shall be for the regulation of future cases falling under its provisions.'" Zanesville v.Zanesville Tel. Tel. Co. (1900), 63 Ohio St. 442, 453, quoting Cooley, Const. Lim. 108. In contrast, "[t]he executive power is defined as the power to execute the laws of the State." In reMetzenbaum (1970), 26 Ohio Misc. 47, 48.
 {¶ 84} "Absent an express constitutional provision, the general provision vesting only judicial power in the courts created by the Constitution must be observed." City of Columbusv. Anderson (1985), 27 Ohio App.3d 307, 309. "The administration of justice by the judicial branch of the government cannot be impeded by the other branches of the government in the exercise of their respective powers." State ex rel. Johnston v. Taulbee
(1981), 66 Ohio St.2d 417, paragraph one of the syllabus. Under the Ohio Constitution, "courts `possess all powers necessary to secure and safeguard the free and untrammeled exercise of their judicial functions and cannot be directed, controlled or impeded therein by other branches of the government.'" Thompson at 586, quoting State ex rel. Johnston v. Taulbee (1981),66 Ohio St.2d 417, paragraph two of the syllabus.
 {¶ 85} "`The interpretation of the laws is the proper and peculiar province of the courts.'" State ex rel. Ohio Academy ofTrial Lawyers v. Sheward (1999), 86 Ohio St.3d 451, 493, quoting The Federalist No. 78. And "it is a judicial function to hear and determine a controversy between adverse parties, to ascertain the facts, and, applying the law to the facts, to render a final judgment." Fairview at 190.
 {¶ 86} The majority proposes that we defer to the Board's interpretation of R.C. 121.22(F) so it can "rely on its own discretion" in determining whether or not it has violated that statute. The majority does not point to any constitutional provision indicating that we must or should defer to a public body's interpretation of a statute because none exists. Likewise, it does not point to a statutory provision providing for that deference because none exists. But even if such a statutory provision did exist, we could not follow it since it would be giving judicial powers to public bodies. The Ohio Constitution only grants that power to the courts and a statute which grants it to public bodies would be unconstitutional. Jemison at 163; see also Sheward at 475.
 {¶ 87} A school board, like any public body, is a creature of the legislature and it must obey the statutes the legislature puts in place to regulate its behavior. Brown v. MonroevilleLocal School Dist. Bd. of Edn. (1969), 17 Ohio App.2d 1, 3-4. As a creature of statute, a school board has "no more authority than what has been conferred on them by statute or what is clearly implied therefrom." Wolf v. Cuyahoga Falls City School Dist. Bd.of Edn. (1990), 52 Ohio St.3d 222, 223. R.C. 121.22(F) regulates the Board's behavior and its authority to be the entity primarily responsible for interpreting what the General Assembly meant when it drafted R.C. 121.22(F) is not conferred and cannot be implied from any statute.
 {¶ 88} I cannot concur in the majority's analysis because it is our job to judge whether or not the Board violated R.C.121.22(F). To do so, we must determine whether or not there was an emergency at the time of the "emergency meeting". We cannot abandon our responsibilities by relying on the Board's discretion to determine what it thinks is an emergency. "Clearly, when a case is properly before the court for review and final determination, we as judges are not at liberty to ignore our obligations." DeRolph v. State (2001), 93 Ohio St.3d 309, 328 (Douglas, J., concurring). Accordingly, I would affirm the trial court's conclusion that the Board violated R.C. 121.22(F) by failing to give proper notice of the February 27th special meeting.
 Civil Forfeiture {¶ 89} Appellants' final assignment of error is based on their belief that they did not violate any aspect of R.C. 121.22. Since I conclude the trial court failed to properly notify the news media of the February 27th meeting, I would find this assignment of error is meritless.
 {¶ 90} R.C. 121.2(I) provides the penalties for violating R.C. 121.22.
 {¶ 91} "(I)(1) Any person may bring an action to enforce this section. An action under division (I)(1) of this section shall be brought within two years after the date of the alleged violation or threatened violation. Upon proof of a violation or threatened violation of this section in an action brought by any person, the court of common pleas shall issue an injunction to compel the members of the public body to comply with its provisions.
 {¶ 92} "(2)(a) If the court of common pleas issues an injunction pursuant to division (I)(1) of this section, the court shall order the public body that it enjoins to pay a civil forfeiture of five hundred dollars to the party that sought the injunction and shall award to that party all court costs and, subject to reduction as described in division (I)(2) of this section, reasonable attorney's fees. The court, in its discretion, may reduce an award of attorney's fees to the party that sought the injunction or not award attorney's fees to that party if the court determines both of the following:
 {¶ 93} "(i) That, based on the ordinary application of statutory law and case law as it existed at the time of violation or threatened violation that was the basis of the injunction, a well-informed public body reasonably would believe that the public body was not violating or threatening to violate this section;
 {¶ 94} "(ii) That a well-informed public body reasonably would believe that the conduct or threatened conduct that was the basis of the injunction would serve the public policy that underlies the authority that is asserted as permitting that conduct or threatened conduct." R.C. 121.22(I).
 {¶ 95} Since I would affirm the trial court's decision to issue an injunction regarding the February 27th meeting, I would also affirm the civil forfeiture since it is mandated by statute.
 Executive Session {¶ 96} The majority concludes that Wolf failed to point to any evidence which would indicate a violation of R.C. 121.22(G). Thus, it concludes that he failed to bear his burden of proving that there is a genuine issue of material fact regarding whether or not the Board properly entered executive session at the April 5th meeting. I disagree. Although the Board's minutes state that it went into executive session "for the purposes of superintendent search", Wolf's answers to interrogatories state that the Board did not indicate why it was entering executive session before it went into executive session. In addition, Wolf produced a tape recording purporting to be of the April 5th meeting and he argues that tape proves that his allegations are correct. Wolf's evidence conflicts with that produced by the Board on this issue, so there is a genuine issue of material fact on this issue. It was improper for the trial court to grant summary judgment to Wolf on this issue and it is improper for the majority to grant summary judgment to the Board on this issue. Thus, I would remand the matter for further proceedings regarding the April 5, 2002 meeting.